Filed 9/17/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S043520 |
| v. | ) | |
| | ) | |
| CARL DEVON POWELL, | ) | |
| | ) | Sacramento County |
| Defendant and Appellant. | ) | Super. Ct. No. 113126 |
| _____ | ) | |

A jury convicted defendant Carl Devon Powell of first degree murder, robbery, and grand theft. It found that the murder occurred during the robbery and that defendant personally used a firearm. It then returned a verdict of death.[1] The court imposed that sentence, as well as an aggregate determinate sentence of eight years four months. This appeal is automatic. We affirm the death judgment.

---

[1] Two codefendants, John and Terry Hodges, were tried with defendant, but before a separate jury. At the end of the guilt phase, the Hodges brothers were granted mistrials because the prosecutor, in his opening statement, informed their jury of testimony he anticipated from defendant that incriminated them. Defendant, however ultimately exercised his constitutional right not to testify. All references to defendant are to Mr. Powell.

## I. FACTS

### A. *Guilt Phase*

Keith McDade and his wife Colleen owned and managed a Kentucky Fried Chicken (KFC) franchise in Sacramento. Between 10:30 and 11:00 on the night of January 19, 1992, Keith left the building with a box of chicken and the day's receipts. While sitting in his parked car, he was shot in the head at point-blank range. A KFC box and a bank bag were later found by the roadside two or three miles away. The bank bag had been cut open. Inside were a deposit slip, a personal check of the McDades, and some KFC gift certificates.

Defendant, an 18-year-old former employee, was soon arrested. His fingerprints were lifted from the recovered chicken box and gift certificates. He gave several versions of the killing. First, he claimed he waited in a car while someone else robbed and killed McDade. Next, he said he shot McDade, but the gun went off accidentally after McDade threatened to have him killed. Then, he admitted he shot intentionally, but only because he was frightened by McDade's threats. Finally, after identifying Terry and John Hodges as his accomplices, he said the brothers had insisted he kill McDade to eliminate him as a witness. This last version was consistent with the testimony of Daryl Leisey, an acquaintance of Terry Hodges. Terry told Leisey that "the other guy" had been taking too long, so Terry had to tell him to "get it over with" and "just whack the motherfucker." Terry wanted no witnesses. The shooter was a "wimp" who had "no heart," so Terry had to "jack him up." Eric Banks, a cellmate of John Hodges, gave similar testimony. John told Banks that defendant had not wanted to kill anyone, but John ordered him to kill McDade so he could not identify them.

On a car trip from Stockton to Sacramento, defendant confessed his role in the crimes to Angela Littlejohn, the mother of a friend. He said McDade had threatened him and "had it coming." When Littlejohn learned that defendant had

2

the murder weapon with him, she demanded he give it to her. She was afraid he might use it against her or get her son into trouble with it. Defendant surrendered the weapon, but later asked Littlejohn to return it. She refused and eventually threw it in a dumpster. Officers retrieved the weapon. The bullet recovered during the autopsy was damaged, but bore markings consistent with the barrel of the recovered gun.

Eight to nine months before the murder, the McDades had discovered that three of their franchise's daily deposits were not reflected on their bank records. The amounts were about $800, $1,500, and $2,000. Defendant had worked on the days these deposits were to be made. The McDades told all their employees they would hire an investigator unless the money was returned. The next day, defendant called and said he had to leave town. They told him he had to complete his schedule for the week or lose his job, as was their policy. Defendant did not come to work. After he left his job, he spoke to another KFC employee about robbing the restaurant. Later in the summer, he began asking for his job back. They did not want to rehire him, given the circumstances of his departure. During his police interview, defendant admitted to three thefts from the business in the amounts of $1,600, $2,200, and either $800 or $1,100.

B. *Penalty Phase*

Widow Colleen McDade testified that she and Keith had a good relationship with defendant. They tried to help him, and he would talk to them about personal problems at school or with girls. He played with their children at the store. They would give him bus money if he needed an advance on his paycheck. Initially he was a good worker, but his performance declined. He came in late and missed shifts, then the thefts occurred. Colleen recounted the impact of Keith's murder on her and their children. Her mother gave similar testimony.

3

Witnesses described previous assaults in which defendant participated, several of them gang-related. A detective testified that in late 1991 defendant was known as a "main player" in the Freeport Crips gang.

In mitigation, the defense presented testimony from defendant's mother, brothers, and a family friend about his upbringing in a South Central Los Angeles neighborhood rife with gangs and drugs. His father left the family when defendant was one or two years old. His mother struggled to raise six children, sometimes working two jobs. Defendant participated regularly in church activities. When he was 16, his family wanted him to get out of the neighborhood, so they sent him to live with his brother in Sacramento. He attended high school there and helped care for his brother's children. He liked his job at KFC, but had difficulty with school.

His family did not know defendant belonged to a gang. His relatives acknowledged the pain caused by the murder and expressed their sympathy. An expert testified about the social structure of gangs and how older members manipulate those younger and less sophisticated. A psychologist testified that defendant's intelligence quotient was in the fourth percentile, bordering on intellectual disability. On a personality test, he scored high for paranoia, deviant thought patterns, anxiety, and introversion. He was incapable of complex planning but susceptible to manipulation. Jail officers testified that defendant was a trustworthy inmate worker.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Use of Dual Juries*

Early in pretrial proceedings, Terry Hodges moved for a severance, anticipating that defendant's statements to the police would implicate the Hodges

4

brothers. He argued admission of defendant's hearsay statements would deprive them of the opportunity to confront him as a witness. (See *Bruton v. United States* (1968) 391 U.S. 123, 126; *People v. Aranda* (1965) 63 Cal.2d 518, 524.) The severance motion was granted, but the court considered whether to hold separate trials or one trial with separate juries.

The prosecutor requested dual juries. At the first court hearing, defendant's counsel said defendant would testify *in the prosecution's case-in-chief* that the Hodges brothers had forced him to commit the killing. This unusual defense strategy was to have a transformative impact on the trial. The court pointed out that there could be no assurance defendant would actually waive his privilege against self-incrimination and take the stand. The prosecutor said defense counsel "seems pretty firm that his client is going to testify," and defense counsel confirmed that intent. At the next hearing, the court observed that if defendant testified, the need for either a severance or dual juries would be eliminated. However, the prosecutor and defense counsel agreed that no one could know for certain whether defendant would take the stand when the time came. Nevertheless, defendant's counsel repeated his expectation that his client would do so, and the prosecutor maintained his request for separate juries. Defendant's counsel concurred with that preference, noting he had not joined in Terry Hodges's severance motion. Counsel for John Hodges stated a preference for separate trials.

At a later hearing on the admissibility of statements made by the Hodges brothers, John's counsel emphasized the conflicting interests among the defendants. Defendant's counsel responded that antagonistic defenses were not necessarily a ground for severance and contended the Hodges brothers were

5

attempting to "escape, basically, from a joint trial." He conceded that on certain issues, his position was closer to the prosecutor's than to the Hodges brothers'.[2] Counsel adhered to his promise that defendant would testify and also to his preference for a joint trial. Subsequently, the prosecutor mentioned the possibility of trying defendant with one of the brothers and conducting a separate trial for the remaining brother. Defendant's two lawyers said their first choice was for one jury. Otherwise, they preferred a single trial with separate juries. The prosecutor finally opted for dual juries. Defendant's counsel said, "Sounds reasonable to me." The court chose that procedure.

The prosecutor's opening statement was given to both juries. Ultimately, despite his counsel's repeated assurances, defendant elected not to testify. He now contends the court erred by employing two juries. He recognizes that dual juries are an accepted means of honoring the statutory presumption favoring joint trials. (Pen. Code, § 1098;[3] *People v. Jackson* (1996) 13 Cal.4th 1164, 1207-1208 (*Jackson*); *People v. Harris* (1989) 47 Cal.3d 1047, 1075.) Nonetheless, he contends he was prejudiced by the prosecutor's opening statement, which related defendant's expected testimony that the Hodges brothers had coerced him into shooting McDade. Defendant urges that the jury would have drawn a negative inference against him when no such testimony was forthcoming. He also argues he was prejudiced by the brothers' antagonistic defenses, their attacks on the credibility of Leisey and Banks, and their disappearance after mistrials were

---

[2]	Both the prosecution and defendant's counsel wanted defendant's testimony against the Hodges brothers. The defense sought to shift blame to them. The prosecutor acknowledged that if defendant did not testify, the case against the brothers would rest on the testimony of Daryl Leisey and Eric Banks, both of whom had credibility problems.

[3]	Further undesignated statutory references are to the Penal Code.

declared upon his refusal to testify. He further complains of the logistical difficulties posed by having two juries in a courtroom designed for one and the likelihood that his jury speculated about the evidence it did not hear when excused from the courtroom.**4**

The Attorney General contends defendant has forfeited these claims by failing to object below and, indeed, invited any error by endorsing the idea of dual juries. We agree. Defendant's counsel repeatedly made it plain that they wanted to go to trial with the Hodges brothers. If one jury were not possible, counsel consistently favored two. Given this oft-stated tactical preference, defendant is in no position to claim error. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.) He asserts his counsel's objection to a severance encompassed the dual jury question. The argument fails. Counsel steadfastly opposed the idea of separate trials, but never objected to dual juries. To the contrary, they affirmatively expressed their approval of the procedure on a number of occasions.

In any event, defendant fails to demonstrate error in the use of two juries. "Whether the court abused its discretion by denying complete severance and impaneling separate juries is decided on the basis of the facts known at the time of the ruling on the severance motion." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1287 (*Cummings*).) Defendant concedes that when the trial court made its ruling, dual juries were a proper option. He cannot show, based on subsequent events, any "identifiable prejudice or 'gross unfairness [that deprived him] of a fair trial or due process of law.' " (*Ibid.*) His primary ground for asserting prejudice arises

---

**4** Defendant asserts violations of his right to a fair trial under the Fourteenth Amendment, his right to remain silent under the Fifth Amendment, his rights to trial by jury and effective assistance of counsel under the Sixth Amendment, and his right to a reliable guilt and penalty determination under the Eighth Amendment.

from his own decision not to testify, which disrupted the trial strategy of his defense team. As discussed more fully below, no cognizable prejudice or unfairness resulted from defendant's exercise of his privilege not to testify.

His remaining arguments fail as well. Claims of antagonistic defenses and attempts by codefense counsel to discredit witnesses are insufficient. (*Jackson*, *supra*, 13 Cal.4th at pp. 1208-1209; see *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150, 153.) As to the Hodges brothers' absence after their mistrials, the trial court instructed the jury not to speculate about their status and to decide defendant's case based solely on the evidence about him. Logistical difficulties, and the potential for jury speculation about evidence received in its absence, are not necessarily an impediment to the use of dual juries. (*People v. Harris*, *supra*, 47 Cal.3d at pp. 1071-1072.) Defendant's description of the inconveniences caused by having two juries falls well short of establishing identifiable prejudice or gross unfairness. (*Cummings*, *supra*, 4 Cal.4th at p. 1287.)

### 2. *Refusal To Exclude Jurors for Cause*

The juries for defendant and the Hodges brothers were selected separately. Defendant contends the court erroneously failed to exclude two of his jurors for cause, requiring the defense to use peremptory challenges to remove them.[5] The defense eventually exhausted its peremptory challenges but expressed no dissatisfaction with the jury as empaneled. The Attorney General urges this failure to protest forfeited any claim of error. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 121, fn. 4.) Defendant correctly notes we have not required expressed

---

[5] He claims violations of his rights to a fair trial under the Sixth Amendment and article I, section 16 of the California Constitution; to due process under the Fifth and Fourteenth Amendments and article I, sections 7 and 15 of the California Constitution; and to a fair and reliable penalty determination under the Eighth and Fourteenth Amendments and article I, section 17 of the California Constitution.

8

dissatisfaction when, as here, the trial took place before our decision in *Crittenden*. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1055 (*Wallace*); *People v. Boyette* (2002) 29 Cal.4th 381, 416.)

We need not examine the merits of defendant's claim because he cannot establish prejudice. He argues that if he had not been required to use peremptory challenges on two prospective jurors, he could then have struck Juror Nos. 1 and 5. He now claims both of these jurors were constitutionally inadequate. The argument is not sustainable. The defense challenged neither juror for cause. Subsequently, with peremptory challenges still available, defendant's counsel twice expressed their willingness to accept panels including Juror Nos. 1 and 5. Accordingly, defendant cannot now claim he was forced to keep these jurors.

### 3. *Defendant's Absence from Certain Proceedings*

Defendant claims his absence from certain pretrial proceedings violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, section 15 of the California Constitution. Defendant fails to demonstrate prejudice.

" 'Under the Sixth Amendment's confrontation clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." ' [Citation.] [¶] 'Similarly, under the Fourteenth Amendment's due process clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless he finds himself at a "stage . . . that is critical to [the] outcome" and "his presence would contribute to the fairness of the procedure." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1231 (*Cole*); see *People v. Castaneda* (2011) 51 Cal.4th 1292, 1317-1318.) " 'The state constitutional right to be present at trial is generally coextensive with the federal

9

due process right.' " (*People v. Butler* (2009) 46 Cal.4th 847, 861.) "Under article I, section 15 of the California Constitution, 'a criminal defendant does not have a right to be personally present "either in chambers or at bench discussions that occur outside of the jury's presence on questions of law or other matters as to which [his] presence does not bear a ' " 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.' " ' " ' " (*Cole*, at p. 1231; see *Castaneda*, at p. 1318.)[6] "Erroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice." (*People v. Perry* (2006) 38 Cal.4th 302, 312; see *People v. Delgado* (2017) 2 Cal.5th 544, 569, fn. 14 (*Delgado*).)

Defendant complains he was absent from several proceedings when the court and counsel discussed whether he would testify, the substance of his possible testimony, and whether the prosecutor would mention his anticipated testimony in opening statements. As set out below, however, defendant was present for numerous other hearings at which these subjects were thoroughly covered. Moreover, the court directly advised him that the decision was his alone and made sure he understood its consequences. Any possible error was harmless beyond a reasonable doubt.

Defendant was absent from a chambers hearing on April 18, 1994, when the court and counsel discussed the theory of his defense and its impact on whether dual juries would be required. At that hearing, his counsel disclosed that

---

[6]     Defendant develops no distinct arguments under the Fifth, Sixth, or Eighth Amendments. He mentions his statutory right to be present under sections 977 and 1043, but makes no explicit argument for statutory error. In any event, for the reasons we discuss in connection with his constitutional arguments, it is not reasonably probable that he would have obtained a more favorable result at either phase of trial had his statutory rights been strictly observed. (See *People v. Weaver* (2001) 26 Cal.4th 876, 968.)

defendant was prepared to testify for the prosecution that the Hodges brothers had coerced him to shoot McDade. However, on the afternoon of the same day, defendant was present when the court explained that if he did in fact testify, there would be no need for dual juries because he would be subject to cross-examination. Only if he decided not to testify would separate juries be required. (See *Bruton v. United States*, *supra*, 391 U.S. at p. 126; *People v. Aranda*, *supra*, 63 Cal.2d at p. 524.) In defendant's presence, it was made abundantly plain that no one could be sure whether he would testify until he actually took the stand. His counsel agreed, adding that while defendant was expected to testify, he could change his mind.

Defendant was absent from a portion of an April 19 discussion about whether to hold a conditional examination to determine the substance of his testimony. This option was not pursued. Defendant was present the next day when his counsel outlined strategies for preserving the Hodges brothers' confrontation rights. Counsel said, "We are willing to go forward with any procedure that the Court can fashion to guarantee that the codefendants have an effective right to cross-examine."

Defendant was present on May 3 when his possible testimony was discussed again. The court mentioned the potential for conflicts between his anticipated testimony and his statements to the police. His counsel again made it clear that an "ironclad guarantee" of defendant's testimony was impossible and mentioned that the prosecutor might have to redact his opening statement to avoid exposing the jurors to evidence that might not be presented. Defendant was present on May 9 when his possible testimony and its effect on the dual jury question were yet again subjects of discussion. On May 17, in defendant's absence, the court and his counsel considered whether the possibility that defendant might not testify should be mentioned during jury selection. One of his

11

lawyers initially resisted the notion, expressing confidence that defendant would testify. However, after consulting with cocounsel, he changed his mind and asked the court to address the question.

On the morning of July 6, defendant was evidently present for an extensive discussion of the order of proof in the event he did not testify.[7] During that discussion, the court and all counsel explored at length the issues that might arise from the prosecutor's inclusion of defendant's expected testimony in his opening statement. At the end of the hearing, counsel for Terry Hodges moved to preclude the prosecutor from mentioning the subject. After a recess, and in defendant's absence, there was further consideration of the topic. The court declined to bar the prosecutor from bringing up defendant's expected testimony. It acknowledged that the Hodges brothers might be entitled to mistrials if the prosecutor went into the subject and defendant then decided not to take the stand. It ordered defendant's counsel to disclose to them any consideration defendant may have received from the prosecution in exchange for his testimony. Counsel and the prosecutor insisted that no such consideration had been offered or received.

On July 11, defendant was absent when the prosecutor briefly indicated that his opening statement would include defendant's expected testimony and his conflicting statements to the police. The following day, however, defendant was present when these subjects were discussed at length. The prosecutor made clear his opening statement plans. Moreover, at this hearing the court questioned all the defendants to make sure they understood their constitutional right not to testify,

---

[7]     The clerk's transcript states that all defendants were present with counsel. The reporter's transcript does not reflect defendant's presence in the opening summary of attendance at this hearing, but the court stated that "everyone" was present, except for one of defendant's attorneys and one of John Hodges's attorneys. Ordinarily, the court noted on the record if the defendants were absent.

12

telling them that "when the case is over that will have been your decision and not simply because your attorney told you not to or made you testify." Defendant said he understood. The court told all defendants that if they did not testify, the jury would be told not to consider their refusal as a factor in its deliberations. The court commented that "no counsel, no one in the world . . . can understand and know that a defendant — any defendant — in any actual case is going to testify."

This review of the proceedings shows that defendant had ample opportunity, early and often, to participate in the preparation and discussion of his defense during pretrial hearings. He knew the prosecutor's opening statement would include the substance of his anticipated testimony and fully understood the consequences of his decision whether to testify. No significant subject was discussed in his absence that was not thoroughly covered in his presence. Accordingly, defendant cannot demonstrate prejudice on this record. (See *Delgado, supra,* 2 Cal.5th at p. 569 [exclusion from in-chambers conference harmless]; *People v. Thompson* (2016) 1 Cal.5th 1043, 1098 [same as to ex parte hearings].)

B. *Guilt Phase Issues*

1. *The Prosecutor's Opening Statement*

In opening statement, the prosecutor said "it is my understanding that Carl Powell is going to testify." Defendant would testify that he and the Hodges brothers discussed robbing the KFC. When they went there on the day of the murder, defendant learned that "they're hiring again." Later, "they went back . . . Keith [McDade] was just leaving, locking the door. They pulled into a parking carport . . . next door and in back."

The prosecutor continued: "Carl got out and went to talk to Keith. Carl left the gun in the car. It was fully loaded. Carl talked to Keith 10 to 15 minutes.

13

Keith said: 'Talk to me Monday about getting . . . your job back.' Terry and John [Hodges] then came walking up. Carl did not have the gun. Terry and John now started talking about robbing Keith McDade. Terry and John were going to take the money. John had a two-shot derringer with him, and Terry had a short shotgun . . . . John said, 'We're going to take the money.' Keith was just sitting there. John had the derringer out. Terry reached into the car and got the money. Or Keith handed Terry the money. Carl . . . does not remember which, according to his proposed testimony. John handed Carl his gun. Carl Powell could tell there was only one round in it based on its weight. Carl started to point the gun at John. Terry drew down on Carl with a shotgun. Terry said, 'don't even think about it.' Carl knew he had only one bullet. John put the derringer to Carl's chest, said, 'We ain't leaving no witnesses.' Carl said there was nothing he could do; Carl pointed the gun at Keith and pulled the trigger." The prosecutor then related defendant's expected testimony about the getaway, during which defendant cut open the bank bag and threw some papers from the car.

Defendant ultimately declined to testify in either the prosecution's case or his own. After the defense rested, the Hodges brothers were granted mistrials. Defendant also sought a mistrial. He argued that the prosecutor's opening statement amounted to a comment on his failure to testify in violation of *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*). The court pointed out that the defense had never objected to the prosecutor's comments and, in fact, had "orchestrated this thing to the point of having the D.A. do your bidding and make a representation of what Carl Powell would testify to." Counsel were well aware that defendant could change his mind. Nevertheless, they "elected not to object to the D.A. putting that in front of the jury." The court denied the motion for a mistrial, finding that "whatever error was committed was invited," and its effect could be mitigated by a proper admonition to the jury.

14

The court gave the usual jury instructions that statements by counsel are not evidence, and a defendant's failure to testify is not to be considered during deliberations. It also gave a specially tailored instruction, approved by defendant's counsel, that "any references in the prosecutor's opening statement concerning the expected content of the testimony of the defendant is to be disregarded and not enter into your deliberations in any way. The fact that the defendant elected to exercise his right not to testify may not in any way be held against the defendant nor affect your verdict."

Defendant contends the prosecutor's "false promise" of his testimony invited the jury to draw an adverse inference from his silence and amounted to *Griffin* error. He also claims prosecutorial misconduct and violation of his rights to due process and a fair trial.[8] In a supplemental brief, defendant additionally argues the trial court erred by allowing the prosecutor to mention defendant's potential testimony during opening statements. These arguments lack merit. As the trial court ruled, any error was invited by the defense's calculated strategy to have defendant testify during the prosecutor's case-in-chief. (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 49.) In any event, the prosecutor made no comment on defendant's failure to testify. He adopted the defense's representation of the expected testimony. That choice cannot be deemed misconduct or court error in light of defense counsel's repeated assurances that their client intended to take the stand and their decision not to object to the opening statement.

Nor can defendant claim he was denied a fair trial because he elected to ignore his counsel's advice. The implications of the defense strategy were

---

[8] Defendant cites the Fifth, Sixth, and Fourteenth Amendments and article I, sections 7 and 15 of the California Constitution.

thoroughly explored pretrial in his presence. (See pt. II.A.3, *ante*, pp. 9-13.) He knew that his lawyers expected him to testify and that the prosecutor would present that expected testimony to the jury. Indeed, the only reason the prosecutor had that information was because the defense revealed it to him as a matter of tactics. Defendant also knew all along that the final decision whether to take the stand was his alone. He understood the consequences of that choice. During trial, at a hearing on a request by defendant for new counsel, the court told him that if he elected not to testify, the jury would decide the case based on the evidence that was presented. It advised him that his failure to testify would not be a ground for mistrial. (See pt. II.B.3, *post*, pp. 24-25.) Defendant's fully informed decision to remain silent cannot be transmuted into prosecutorial misconduct or court error.

Defendant claims the jury would have inferred that he did not testify because his statements implicating the Hodges brothers were false. We disagree. The jury was specifically instructed not to give any consideration to defendant's exercise of his right not to testify. In any event, there is no reason to believe jurors would surmise that defendant decided not to take the stand to avoid giving false testimony. We note that his anticipated testimony was already questionable because it conflicted with the various versions of the shooting he had given to the police and Littlejohn.

Defendant relies on *Ouber v. Guarino* (1st Cir. 2002) 293 F.3d 19. There, a habeas corpus petitioner claimed her counsel was ineffective for promising in opening statement that she would testify but later deciding not to call her as a witness. It appeared the petitioner wanted to testify, but counsel persuaded her otherwise. (*Id*. at pp. 22-24.) *Ouber*, of course, is not binding precedent. (*People v. Collins* (2010) 49 Cal.4th 175, 233; *People v. Williams* (1997) 16 Cal.4th 153, 190.) It is also not on point. Defendant makes no claim of ineffective assistance, and it was he alone who decided not to testify. Nor does he claim his decision was

16

uninformed. (Cf. *Ouber*, at p. 31.) The *Ouber* court affirmed a grant of relief, finding that "counsel's belated decision not to present the petitioner's testimony sabotaged the bulk of his efforts prior to that time (and, in the process, undermined his own standing with the jury, thereby further diminishing the petitioner's chances of success)." (*Id.* at p. 34.) No such error occurred here. Defense counsel did not belatedly change plans. It was defendant who chose to abandon their strategy.

Defendant also relies on *Lockett v. Ohio* (1978) 438 U.S. 586 (*Lockett*), claiming it shows that *Griffin* error can arise from the unfulfilled promise of a defendant's testimony. He misreads the case. There, the defense argued that "the prosecutor's repeated references in his closing remarks to the State's evidence as 'unrefuted' and 'uncontradicted' constituted a comment on her failure to testify and violated her Fifth and Fourteenth Amendment rights. See *Griffin*[, *supra*,] 380 U.S. [at p.] 615." (*Id.* at pp. 594-595.) The court disagreed, reasoning that "Lockett's own counsel had clearly focused the jury's attention on her silence, first, by outlining her contemplated defense in his opening statement and, second, by stating to the court and jury near the close of the case, that Lockett would be the 'next witness.' When viewed against this background, it seems clear that the prosecutor's closing remarks added nothing to the impression that had already been created by Lockett's refusal to testify after the jury had been promised a defense by her lawyer and told that Lockett would take the stand." (*Id.* at p. 595.)

*Lockett* cuts strongly against defendant's position. Like defendant, Lockett refused to testify in a capital case against counsel's advice after the jury was told what the defense would be and that she would take the stand. (*Lockett*, *supra*, 438 U.S. at pp. 589, 592-593.) The claim of *Griffin* error was summarily rejected, and the court found no fundamental unfairness in the unexpected absence of Lockett's

17

testimony.  In sum, defendant cannot show prosecutorial misconduct or court error on this record.

### 2. *Removal of a Juror for Cause*

On a Monday morning, during a break in guilt phase testimony, the court informed counsel that it had received a phone message from a juror who said she had not been able to sleep for five days and needed counseling.  The same juror had earlier expressed fear to the court attendant about the defendants looking at her and some concern over questioning by counsel.  The court brought the juror in and asked if she was requesting to be excused or seeking some other accommodation.  She replied, "there's some facts of the case that relate really closely to some personal things that have happened to me, so I feel very — I need somebody to talk to, and I don't know who to talk to."

The court asked if the situation was affecting her ability to be impartial. The juror replied, "not necessarily.  But it's just — it's gotten me to the point of — because I started losing sleep the weekend before, so it's been — it's been all week.  And from my past experience when I get like that, I start exploding." Asked if she had mentioned her past experiences in the jury selection process, the juror said, "no.  They're just unresolved issues."  Asked to elaborate, she said, "well, I have had other instances where I — for example, about five years ago or so, I started receiving harassing phone calls at home and — I never knew who it was or anything.  But it started on Friday night, and they continued all weekend. . . .  Luckily, my parents were there. . . .  My dad picked up the phone, and the guy just insisted that he had to talk to me.  He had to talk to me.  Well, I was afraid for my life."  The police and the phone company were unable to do anything because it was a Friday, so the juror unplugged the phone and went out of town.  But she "left the answering machine on, and the guy fills up a tape with

18

obscenities. It was pretty bad; it was a very frightening experience. And it — it caused me to — it caused me to do all kinds of things that I don't normally do."

The calls stopped after the juror changed her phone number. The police or the phone company told her it was probably a random incident. The court asked if any other past experience was causing her distress. She said, "well, I did have an episode again, and I'm having trouble — 1992, when I injured my back, was also — resembled something." She told the court she had never received counseling and would like to get it now. The court inquired what it was about the case that was evoking these past experiences. The juror said, "I find myself identifying with all of the parties and feeling sympathy for everybody." Asked what she meant by "everybody," she answered, "as each issue is brought up, I identify it with myself. But I think that's just because of the sleep deprivation."

Counsel also questioned the juror. She told defense counsel that it would help if there could be a break in the proceedings "when things get really intense." The court asked if she could continue to participate if the normal schedule were followed. She replied, "the reason I called yesterday is because I felt like I had come to the end, like to the end of my rope. And I need somebody to talk to." Counsel asked how she was feeling presently. She said, "I feel okay. I took some sleep medication last night." She admitted she was "very tired." Counsel said he would like her to continue on the jury. She said, "that's what my supervisor told me, that I have a lot of time invested in this. And I should make this the main focus." Asked if she thought she could regain her composure and continue to serve, the juror said, "well, in my line of work, I deal with issues as they come in. Situations, if there's an explosive situation, I handle it. But when I've lost sleep,

19

I'm unable to handle it. And so the reason I talk to my supervisor is I don't want a relapse."[9]

The juror told the prosecutor that she found herself identifying with the defendants. She explained, "well, I put myself in their shoes. I — it's just — it's a very — it's very confusing . . . . On Wednesday, I became very confused and very frightened." The prosecutor asked in what way she was confused. She said, "um, I guess it was the pressure. . . . I just became frightened. . . . I was frightened of the defendants sitting over there, just because they were looking at me. And then later, it dawned on me, that's not what I'm frightened of; I'm frightened of the situation." She explained, "like I said, I closely identified —I was identifying with the witness." The prosecutor asked if it was because Daryl Leisey said he had been threatened. The juror said, "yes. And because of what I've gone through." Asked if she could be impartial, the juror affirmed that "I'm a fair and impartial person." The prosecutor inquired whether she could be fair when she was putting herself in the defendants' shoes. She answered, "well, remember, though, I started losing sleep last weekend, and then — and then I wasn't able to sleep at all. So I get confused when that happens." She said she was not confused at present, "just a little upset is all."

The juror said she was not currently afraid of the defendants. She felt she could continue "if I can resolve these personal issues . . . and if I have somebody to talk to." She did not have anyone to talk to, however, and agreed that her issues might not be resolved if she could not discuss them with someone. In that case, "it would frighten me more and more. And because I would continue to lose sleep. And I get to the point where I — when this happens to me." The prosecutor

---

[9]    The juror worked as a workers' compensation insurance representative.

sought clarification.  She said she was "frightened of — every night I'm afraid that I'm not going to be able to sleep.  It's a general fear."  The fear increased the less she slept.  Asked what she would like to do, the juror said she would like to talk to somebody about her issues.  She could talk to her doctor and get a referral for counseling.  She said she did not know how many counseling sessions she would need.  The prosecutor asked, "three, four, five, ten?"  She said, "yeah."

At this point, the court, after asking the juror to step out of the courtroom, commented:  "She appears to be very fragile emotionally and physically . . . she moves very slowly.  She talks slowly . . . .  Whether she understands counseling with one session or multiple sessions, my concern is that she is seeking assistance from another person dealing with the pressures of the trial, and what is going on in the trial; that is creating pressure to her.  And that is necessarily going to contaminate a juror having to counsel with someone about dealing with the jury function, and how this relates to her prior difficulties."  For these reasons, the court leaned toward excusing the juror.  "Requiring her to continue with the case without undergoing counseling or assistance would be asking too much of her.  And to the point where she may have a significant emotional breakdown."  Defense counsel objected; the prosecutor sought removal.  The court discharged the juror.

Defendant contends this action violated his rights under the Sixth and Fourteenth Amendments and article I, section 16 of the state Constitution.  " 'If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . .' (§ 1089.)  Removal of a juror under section 1089 is committed to the discretion of the trial court, and we review such decisions by asking whether the grounds for

21

such removal appear in the record as a demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137.)  "The most common application of [section 1089] permits the removal of a juror who becomes physically or emotionally unable to continue to serve as a juror due to illness or other circumstances." (*People v. Cleveland* (2001) 25 Cal.4th 466, 474.)  "We have recognized that both trial-related and non-trial-related stress can provide good cause for discharging a juror.  (See *People v. Collins* (1976) 17 Cal.3d 687, 690–691, 696 [inability to cope with the experience of being a juror]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1099–1100 [anxiety about new job].)" (*Thompson*, at p. 138.)

Here, the excused juror was experiencing extreme stress caused by issues both trial-related and personal.  Her answers to questioning by the court and counsel were less than clear, even though she said she was feeling better at the time.  She stated that her problems would continue if she could not resolve them through counseling, but she had never received counseling.  Neither she nor anyone else could say how much counseling might be required or if it would help. Defendant emphasizes that the juror did not ask to be excused, but that is not a dispositive factor.  Defendant faults the trial court for being concerned that counseling might lead the juror to improperly discuss trial matters.  Yet it was logical to conclude that counseling necessitated by the stress of trial would involve some discussion of trial proceedings and her reactions to jury service.  Any such conversation by a sitting juror would be highly inappropriate.  It also appears the juror had told her supervisor about her jury service and the problems it was causing her.

The court was confronted with an emotionally fragile, frightened, and confused juror whose past experiences led her to identify herself both with prosecution witness Leisey and with the defendants.  At the same time, she became fearful of the defendants when they looked at her.  On this record, the

22

court was well within its discretion to find that the juror was emotionally unable to discharge her duty to decide the case impartially. We defer to the trial court's assessment of her mental and physical condition based "on firsthand observations unavailable to us on appeal." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.) Here, as in *Barnwell*, "the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Ibid*.)

### 3. Marsden *Claim*

After the juror was excused, the court read into the record a note from defendant, saying he wanted "to make a mistrial motion for myself" because of "misrepresentation" by his lead counsel, who was "siding with the D.A." and "hasn't been fair for me at all" because he "hasn't made one motion on my behalf." Defendant also asked "that I have new counsel to represent me." The court held a hearing with only defendant and his counsel present. (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).) Defendant complained about counsel being friendly in court with the prosecutor but said, "I don't want to fire him; I just feel that I should have a mistrial." Defendant said counsel had "basically given the case to the D.A., because he hasn't filed any motions to try to get anything that could hurt me thrown out." The court declined to grant a mistrial and noted that defendant was not requesting new counsel.

Two days later, near the close of the prosecution's case, defendant again asked for a mistrial. The court informed him that the motion had to be made through counsel. Defendant said, "Well, I'll again make a motion to — *Marsden* — to fire him because he ain't making no motion." The court held another *Marsden* hearing, at which defendant complained that his attorneys were cooperating with the prosecutor and not doing "the defense job." The court asked if that was the extent of his complaint, and defendant said, "yeah, basically." The

23

court explained to defendant that this was a difficult case for his counsel given the strong evidence of his identity as the shooter and that they were "attempting to save you by shifting some of the responsibility and blame on to the other defendants," which is why they were not objecting to evidence supporting the Hodges brothers' role as "manipulators."

The court told defendant that there were no grounds to exclude the evidence that had come in against him and no grounds for a mistrial. Defendant said he understood what the court had said. The court asked if he had any other reason to ask for new counsel. Defendant said counsel "should have at least . . . tried to attack my confession, because . . . well, I wasn't under the full influence of alcohol, but I had been drinking before I got arrested." Counsel explained that he could find no basis for excluding the confession and pointed out that defendant's statements to Littlejohn about the shooting were equally damaging. He said the reason the defense decided not to join in the Hodges brothers' mistrial motions was because the evidence that had come in against them was helpful to defendant. The court observed that it would be logistically difficult for another attorney to take over the case at such an advanced stage of trial and "not necessary."

The court told defendant that "the big issue in this case" was whether he was going to testify, emphasizing that the decision was his alone. Defendant said he understood. The court advised him that, either way, he would not be heard to complain about his decision later. Defendant asked whether a mistrial would be granted if he did not testify. The court said, "It wouldn't be a basis for you to ask for a mistrial because you elected not to testify. If you don't testify, your jury is going to decide the case based on what they've heard without your testimony. If you do testify, they're going to decide your case based on what they've heard, including your testimony. And you may either help or hurt your case when you testify. That all remains to be seen." Defendant said he understood. The court

24

suggested that he listen to the advice of his attorneys and then "just make the decision yourself." Defendant again said he understood. He did not renew his request for new counsel.

Five days later, defendant made another *Marsden* motion. By this point, he had decided not to testify, and the court had denied his counsel's request for a mistrial based on *Griffin* error. (*Griffin*, *supra*, 380 U.S. 609; see pt. II.B.1, *ante*, pp. 14-18.) Defendant said the basis for his motion was counsel's failure to object to the prosecutor's opening statement, which the court had noted when it refused to grant a mistrial. Counsel explained that they had not objected because they expected defendant to testify. The court denied the motion.

Defendant contends the court failed to make an adequate inquiry into whether he had an irreconcilable conflict with counsel.[10] (*Marsden*, *supra*, 2 Cal.3d at pp. 123-124.) The record shows the opposite. At each *Marsden* hearing, the court ascertained the basis for defendant's complaints. Initially, defendant explained that he did not want a new attorney, only a mistrial. At the second hearing, the court took care to explain the theory being pursued by defense counsel in light of the strong evidence against defendant. It made sure he understood that his own testimony would be an important factor and one that was under his sole control. Defendant repeatedly said he understood. At the third hearing, defendant made it plain that his dissatisfaction arose not from any irreconcilable conflict but from a belated disagreement over trial strategy. The court gave him ample opportunity to state his reasons for wanting new counsel.

---

[10]    He claims violation of his rights under the Sixth Amendment and article I, section 15 of the California Constitution.

25

### 4. *Firearm Evidence*

The murder weapon was a .38-caliber revolver, which defendant gave to Angela Littlejohn after the shooting. She threw it in a dumpster but later assisted the police in its recovery. On appeal, defendant claims evidence that he possessed *other* firearms was improperly admitted. No objection was made on this ground. In any event, the other firearm evidence was largely tangential and could not have affected the outcome of either the guilt or penalty phases.

Two KFC employees testified that several months before the murder, defendant came to the business and showed them a handgun. One witness said this gun did not resemble the murder weapon; the other was not sure. Asked by John Hodges's counsel about defendant's connections with guns, one witness said he heard that defendant had sold a shotgun. No objections were made to this testimony.

Later in the trial, just before defendant's videotaped statement to the police was played, his counsel asked the court to redact portions in which defendant talked about owning a .32 automatic handgun and about a picture showing him with that weapon. Counsel was concerned that this part of the statement would open the door to admission of the photograph itself, in which defendant and a friend were making gang signs. The court noted that the statement included no mention of gangs, and the gun "may or may not be a weapon that witnesses have testified he had possession of earlier." The prosecutor assured the court that he did not intend to present the photograph, which the court had earlier ruled inadmissible. The court pointed out, "what that means is that what the jury will have is no more and no less than this reference to a .32, and that he took a picture with it. It doesn't suggest gangs. It doesn't infer gangs in any way. It does admit ownership of another firearm. And I don't agree with you that it is irrelevant, prejudicial, or inadmissible." Counsel conceded there were no gang connotations

26

in the statement and said that, as long as the picture was not going to be presented in evidence, "I would still object to it, but I feel a little bit better."

Defendant now complains that this evidence of his firearm possession amounted to inadmissible bad character evidence and improper collateral impeachment of his statement to the officer that the .32 was the only gun he had ever owned.[11]  These grounds were not asserted below and are forfeited.  (Evid. Code, § 353; *People v. Carey* (2007) 41 Cal.4th 109, 126 (*Carey*).)  Counsel's sole objection was based on the gang connotations of his client's weapons possession. There is no merit to defendant's claim that the court's ruling on this objection shows that others would have been futile.  In any event, the "other firearm" evidence was of minor significance.  Given the strong evidence of defendant's possession and use of the murder weapon, evidence that he had other firearms earlier added little.

### 5. *Gang Evidence*

Before trial, defendant's counsel requested that "no mention be made of any gang involvement."  In response, the prosecutor asked that he be allowed to impeach defendant with evidence of his membership in the Crips gang.  The court did not rule on the defense request but said "at least as far as articulated so far, I will deny the D.A.'s motion to permit evidence concerning Carl Powell's alleged gang affiliation as . . . reflecting on his credibility and moral turpitude." Subsequently, the court ruled that "no references in opening statements be made to claims of . . . gang affiliations of various defendants or other persons."

---

[11]     He relies on his rights to a fair trial under the Fourteenth Amendment and a reliable penalty determination under the Eighth Amendment.

27

In his opening statement, the prosecutor mentioned that Ruben Martinez, one of defendant's fellow employees, would testify that defendant had two nicknames: "Scrooge" and "Baby Hoove." Defendant did not object. The prosecutor also read the transcript of defendant's police statement, which included an exchange in which the detective asked defendant if he went by any other names. Defendant replied, "Scrooge and Baby Hoove," explaining that "Scrooge was my house name. Baby Hoove was my street name." Asked if he got his street name when he was in Los Angeles, defendant said "yeah." The defense did not object, nor did it object when the prosecutor read a passage in which the detective asked about the street name of Roosevelt Coleman, Angela Littlejohn's son. Defendant said it was "Baby Snake." The prosecutor omitted an earlier portion of the transcript in which defendant affirmed that Coleman was a Crip.

When Martinez testified, the prosecutor asked if he knew defendant's nicknames. The defense objected. The court initially sustained the objection but then asked if the prosecutor's purpose was "what had been detailed in your opening statement?" The prosecutor said "yes," and the objection was overruled. Martinez answered that defendant told him "Baby Hoove or Scrooge," and the questioning moved on to other matters. At a subsequent hearing, defense counsel referred to the court's ruling against gang evidence and pointed out that the prosecutor had questioned Martinez about defendant's nicknames. The court asked, "How does that imply gang membership? If you have a nickname, you're a member of a gang?" The court noted that the defense intended to ask Martinez about gang membership in relation to defendant's anticipated testimony, though such questions would be allowed only if defendant did in fact testify.

Witness Charlie Schuyler saw defendant near the scene around the time of the murder. Outside the presence of the jury, Schuyler told the court that he was unsure whether he should testify about defendant's "gang way of dressing." His

28

pants were "dropped in the back," a style Schuyler identified with Crips. No advisement was requested or given as to how Schuyler should describe defendant's appearance to the jury. Under cross-examination by Terry Hodges's counsel, Schuyler said he had noticed defendant's pants and said "the only way I really know how to word it is in my book he was crippin'." He added a little later, "the way I was brought up it was how you identified a Crip."

There was no objection at the time, but, during the next recess, John Hodges's counsel objected to Schuyler's gang reference and requested a jury admonition. Defendant's counsel said, "I concur with that, although the description of the way the pants were worn was appropriate, and I think that's relevant to the jury. I think it's relevant to what . . . the witness would perceive in aiding his identification. But his characterization of cripping, I think, should be . . . there should be some admonishment. Since it was in before anybody could say anything . . . I think a simple admonition would be appropriate." He explained, "the jury should . . . receive some caution . . . that it's admissible . . . not to show gang involvement or anything, but simply as a description."

The court refused an admonishment "at this time," but said, "depending on what is developed in further testimony, by the end of the case . . . I will consider orders as to the limited admissibility of this and any other evidence. I will agree that the prejudice outweighs the probative value to further question this witness concerning his beliefs as to what it meant for someone to be dressed as they were. And the witness may describe the dress . . . and not volunteer opinions as to whether that meant a gang affiliation."

Before defendant's videotaped statement was played, his counsel requested that the portion in which defendant gave his "house name" and "street name" be taken out because the jurors would think they were gang names. The court pointed out that there had already been references to the Scrooge and Baby Hoove

29

nicknames.  The prosecutor noted the court had already said that nicknames do not necessarily carry a gang connotation.  The court overruled the objection.  Counsel further objected to the inclusion of the references to Coleman as one of defendant's "homies" and his "road dog."  The court overruled that objection as well.  The jury saw and heard the entire videotape, including defendant's answer that Coleman was a Crip.

Defendant claims he was prejudiced by these references.[12]  The Attorney General correctly responds that the claim is forfeited as to many of the references by defense counsel's failure to timely object.  Nor did he request a limiting instruction at the close of evidence, even though the court had expressly left that possibility open.  If the defense considered these references damaging, counsel should have requested limiting instructions.

6.  *Defendant's Statements to Littlejohn*

Angela Littlejohn, who had made defendant give her the murder weapon, told the investigating detective that he "kept pushing" her to give it back to him.  "He say to me, I need that gun, that gun will get me some money."  She also said she asked defendant why he needed the gun, and he replied, "Well, that's the only way I'm going to get the money, with the gun."  Littlejohn added that another of defendant's associates had tried to get the gun as well, but she refused because she feared it might get her son in trouble.

Early in the trial, defense counsel moved to bar Littlejohn from testifying about defendant's desire get the gun back to make money.  He argued that such statements about future intentions did not qualify as character evidence under

---

**12**     Defendant refers to his rights to a fair trial under the Fourteenth Amendment and to a reliable penalty determination under the Eighth Amendment.

Evidence Code section 1101 and were irrelevant. The prosecutor responded that defendant's intent to use the gun to commit more robberies days after the murder tended to prove that he used the gun to rob McDade. Counsel for the Hodges brothers agreed. The court denied the motion, finding that Littlejohn's testimony on this point amounted to an implied admission by defendant that he committed the earlier robbery and was relevant to show consciousness of guilt.

Just before Littlejohn testified, counsel renewed the objection. He asked the court to bar testimony about defendant saying he wanted the gun to commit robbery. Counsel conceded the evidence was relevant on the issue of intent but claimed it was unduly prejudicial under Evidence Code section 352. He argued that if the jurors heard this evidence, the defense would not have a fair chance to persuade them that defendant had approached McDade not to rob him, but to get his job back. The court adhered to its earlier ruling, finding that the probative value of the evidence with respect to defendant's state of mind at the time of the murder outweighed its prejudicial impact. On the stand, Littlejohn claimed she did not remember defendant saying he wanted the gun for robbery. Counsel stipulated to providing the jury with a video of Littlejohn's police statement, including the parts where defendant asked for the gun back so he could use it to get money.

Defendant now argues that, while probative to some extent, this evidence was speculative and highly prejudicial, violating his right to due process. The abuse of discretion standard applies to rulings on admissibility and is particularly appropriate when the trial court's determination involved questions of relevance and state of mind. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.) The court's ruling will not be disturbed unless made "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*Ibid*.) Defendant falls well short of that standard. There was evidence that he had stolen

31

from his employers and had spoken to a KFC employee about robbing the business. He had shown two employees a handgun, though it was evidently not the murder weapon. His requests to recover the murder weapon from Littlejohn so he could "get money" were relevant to his intent to rob McDade. Counsel was correct that this evidence undermined the theory of the defense. However, that impact was what made the evidence relevant.

" 'The prejudice that [Evidence Code] section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Defendant claims his statements to Littlejohn were likely to lead the jury to view him as part of a dangerous group of young African-Americans predisposed to rob and kill. We disagree. The defense sought to show that defendant did not mean to rob or harm McDade. His statements were properly admitted to rebut that claim. There is no reason to believe the jury would have indulged in the speculative and emotional response defendant imagines.

7. *Photographic Evidence*

Before trial, the Hodges brothers moved to exclude photographs of McDade's body at the crime scene and the autopsy, contending they were

32

cumulative and unduly prejudicial.  The court made a preliminary ruling that three of four crime scene photographs were admissible, but that one labeled T-4 was duplicative of T-3.  Both pictures show the body in the car; T-4 was taken at closer range.  The court said it would reconsider if the prosecutor had a witness who could use T-4 to prove something T-3 did not show.  During the testimony of the first responding police officer, the prosecutor established that T-4 showed the powder burns on McDade's temple better than any other photograph.  All defendants objected to the photograph's admission.  The court observed that T-4 did most clearly show the powder burns, which was something "I didn't even notice . . . the first time."  It admitted T-4 as relevant to demonstrate the manner of the shooting.

Defendant claims error, arguing that the powder burns were visible in T-3, and T-4 was inflammatory because it showed a large amount of blood on McDade's chest.[13]  We disagree.  T-4 reveals the nature of the wound, including the powder burns, much more clearly than T-3.  " 'This court is often asked to rule on the propriety of the admission of allegedly gruesome photographs.  [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance.  [Citation.]  " '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant' " [citation] . . . .  [W]e rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative (Evid. Code, § 352).  A trial court's decision to admit photographs . . . will be upheld on appeal unless the prejudicial effect . . . clearly outweighs their probative value. [Citation.]  Finally, prosecutors, it must be remembered, are not obliged to prove

---

[13]     Again, defendant refers to his federal due process rights.

their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case. [Citations.]' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1282, quoting *People v. Gurule* (2002) 28 Cal.4th 557, 624.) The court did not err in this case.

### 8. *Refusal To Instruct on Duress*

While initially inclined to instruct on duress, the court ultimately decided not to do so. It found nothing in the evidence to support an inference that defendant had acted under an immediate threat against his life. It noted the defense could argue that defendant's mental state was affected by pressure from the Hodges brothers. Defendant claims the refusal to instruct was error.[14] Not so.

"The defense of duress is available to defendants who commit crimes, except murder, 'under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.' (§ 26; see *People v. Anderson* (2002) 28 Cal.4th 767, 780.) Although 'duress is not a defense to any form of murder,' (*People v. Anderson*, *supra*, 28 Cal.4th at p. 780) 'duress can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony. [Citations.] If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony.' (*Id*. at p. 784.) A trial court is required to instruct sua

---

**14** Defendant asserts violations of his rights to due process under the Fourteenth Amendment, to counsel and a jury trial under the Sixth Amendment, and to a reliable penalty determination under the Eighth Amendment. For the first time on appeal, he contends that section 26, subdivision Six, which rules out duress as a defense to crimes punishable with death, is unconstitutional. We need not reach that argument, because the court correctly found the evidence insufficient to support a duress defense.

sponte on a duress defense if there is substantial evidence of the defense and if it is not inconsistent with the defendant's theory of the case. (See *People v. Breverman* (1998) 19 Cal.4th 142, 157.)" (*People v. Wilson* (2005) 36 Cal.4th 309, 331.) This requirement does not extend to *any* evidence, no matter how weak. To be "substantial," evidence must be sufficient to deserve the jury's consideration. (*Ibid.*)

Here, there was no evidence that either of the Hodges brothers was armed at the crime scene. Defendant observes that in a videotaped statement played for the jury, Banks said John Hodges "probably had a pistol," but Banks was talking about a time before the shooting when the robbery was being planned. As to the robbery, Banks said John simply "told" defendant to shoot McDade. Defendant also points to Leisey's testimony that Terry Hodges had to "coach" defendant to shoot, but coaching is far from duress. In his police statement, defendant said the brothers were *not* armed. He did not claim they threatened him in any way, only that he felt "pressured." This evidence is insufficient to support an inference of duress. It is true that the version of events in defendant's anticipated testimony included elements of duress. However, defendant elected not to provide that version and the jury was properly instructed to disregard the prosecutor's summary of it in his opening statement.

### 9. *Failure To Instruct on Theft*

When discussing jury instructions, defendant's counsel both agreed it made no sense to instruct the jury on theft as a lesser included offense of robbery. On appeal, however, defendant contends the evidence would have supported a finding that he formed the intent to steal only after shooting McDade. Therefore, he

35

claims, there was a sua sponte duty to instruct on theft.[15] (See *People v. Zamudio* (2008) 43 Cal.4th 327, 360; *People v. Breverman*, *supra*, 19 Cal.4th at p. 162.) The claim fails. Defendant relies on the following portion of his statement to the police, made just after he admitted shooting McDade:

"Lee [the detective]: Alright. It's no secret. I know. I know you pulled the trigger. He wouldn't give it to you because he looked at you and he says, man, . . . get out of here. What did he say to you? Just tell me what he said when you walked up to him.

"Powell: I was talking to him about getting my job back and he was like, come back tomorrow. And I, he didn't say nothing. You know, he just gave me the money. And then he just started talking, just you know, cause there was a lot of stress on my mind, my brother, he was killing me, it's like my brother don't want me around no more.

"Lee: Calvin's getting on your butt because you ain't got a job, right? [16]

"Powell: Yeah, exactly.

"Lee: Okay.

"Powell: You know, and that hurt me. That's why I kept going to Keith cause that's the only job . . . that I'm really good at . . . .

"Lee: So let me ask you, did you wait for him to come out?

"Powell: Uh hmm.

"Lee: Okay. Then he got in the car. And then you walked up to him.

"Powell: That's when I started talking to him.

---

[15]    Defendant claims violations of his rights to due process, trial by jury, and reliable guilt and penalty verdicts under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and his rights to due process and trial by jury under article I, sections 7 and 15 of the state Constitution.
[16]    Calvin was the brother with whom defendant was living in Sacramento.

"Lee: When you walked up to him, just tell me, . . . what did you say to [him]?

"Powell: I said . . . when you gonna let me get my job back. He said . . . we're kinda full right now. And . . . he offered me some chicken. I was like no, I don't want no chicken man, you know.

"Lee: So when you asked him for [your] job, . . . what'd he say, come back and see me tomorrow?

"Powell: Yeah, come back and see me tomorrow.

"Lee: And then what'd you say?

"Powell: I said, okay. And then I was like, what you got in the bag.

"Lee: Uh huh.

"Powell: [Inaudible] money. And then I said, hand it over.

"Lee: Uh hmm.

"Powell: And then he was like, . . . he wanted to get out of the car and hurt me. But I was like, I pulled my gun out and he's like kinda just sat back down. And then he started talking on off the wall stuff like, you know (inaudible) . . . . It's bad enough my brother was killing me and then he was saying stuff . . . .

"Lee: So it was really getting you down?

"Powell: Yeah.

"Lee: Putting some pressure on you?

"Powell: It hurt, it hurt me real bad.

"Lee: Okay. So you pulled your gun out.

"Powell: Uh hmm.

"Lee: And what'd he say?

"Powell: He looked at it.

"Lee: What'd he say?

37

"Powell: He looked and I just said, hand it over and he handed it over and then he really started talking crazy . . . ."

Defendant urges the jury could have gleaned from this passage that McDade freely handed the money to defendant, who only later formed the intent to steal it. The argument beggars belief. The court was not required to instruct on theft.

### 10. *Instructions Given*

#### a. *CALJIC No. 2.50*

The parties discussed CALJIC No. 2.50, regarding evidence of other crimes, based on defendant's weapon possession before the night of the crimes.[17] The prosecutor argued that the possession tended to show that defendant intended to commit an armed robbery. Defense counsel disagreed, arguing that mere possession of a weapon reflects no such intent. The prosecutor pointed out that defendant had told a KFC employee about his robbery plan. Defense counsel briefly disputed that evidence, but the witness did, in fact, clearly relate several of defendant's statements indicating he was contemplating robbery. The court said it would instruct that the evidence could be considered for the limited purposes of showing intent, identity of the perpetrator, and knowledge or possession of means to commit the crime. The court added, "And if you want to make a note about objecting when we go back over the instructions, counsel, do so." No subsequent objection was made.

---

[17] In addition to defendant's display of a handgun at the KFC, there was testimony that he had a handgun with him when he visited a park with friends about a week before the crime.

Although defendant failed to lodge an objection to this instruction, he may nevertheless raise a claim that it affected his substantial rights.[18] (§ 1259; *People v. Benavides* (2005) 35 Cal.4th 69, 111.) He contends the instruction invited irrational inferences based on mere propensity. The claim fails. Defendant concedes that his possession of the murder weapon shortly before the shooting was relevant. The jury could also properly consider his exhibition of a gun to KFC employees some months earlier, around the time he was talking about robbing the establishment. This evidence was relevant as to intent, identity, and knowledge. The connection between the charged offenses and the earlier gun display was sufficiently close that the evidence did not merely reflect general criminal propensity. (See 1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 95, p. 490.) In any event, the instruction included an admonition not to consider the evidence to prove bad character.

b. *CALJIC No. 2.06*

The prosecutor requested CALJIC No. 2.06, on suppression of evidence, based on Angela Littlejohn's disposal of the murder weapon in a dumpster. Defense counsel objected, noting that defendant was trying to get the weapon back, not conceal it. The court gave the instruction, which told the jury: "If you find that a defendant attempted to suppress evidence against himself in any manner such as by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct

---

[18] Defendant invokes the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15 of the state Constitution, and his right to reliable guilt and penalty determinations under the Eighth Amendment and article I, section 17 of the state Constitution.

is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

Defendant argues that nothing in Littlejohn's account of her disposal of the weapon implicated him.[19] She demanded that he give her the gun not for disposal but to prevent further misuse. Defense counsel correctly pointed out that defendant was trying to retrieve the weapon, not hide it. The Attorney General suggests the instruction might apply to defendant's false statements in his police interview or to his disposal of the bank bag and KFC containers after the murder. We need not address these alternative theories. Any error in giving CALJIC No. 2.06 was harmless because the inference it permitted was superfluous. Defendant's consciousness of guilt was not in question given his statements to the police.

### c. *CALJIC No. 2.52*

Defense counsel did not object to CALJIC No. 2.52, which allowed the jury to infer consciousness of guilt from his flight after the crime. Again, because of the failure to object, we review the claim of error only to determine "if the substantial rights of the defendant were affected" by the instruction. (§ 1259.) They were not. As noted, defendant's consciousness of guilt was established in his police interview. It has long been recognized that flight may support an inference to the same effect. (*People v. Abilez* (2007) 41 Cal.4th 472, 521-523.) We decline to consider defendant's arguments, raised for the first time on appeal, based on the definition of "flight."

---

[19]    He claims the instruction violated his federal due process rights.

d. *CALJIC No. 2.71.7*

Defense counsel also raised no objection to CALJIC No. 2.71.7, which advised the jury to consider with caution an "oral statement of intent, plan, motive or design . . . made by the defendant before the offense." Defendant contends the jury could have applied this instruction to Eric Banks's testimony that John Hodges told him defendant had said he did not want to kill McDade. He argues that the cautionary aspect of CALJIC No. 2.71.7 pertains only to statements harmful to the defense. It is true that this instruction properly applies to "any extrajudicial oral statement by the defendant *that is used by the prosecution to prove the defendant's guilt*." (*People v. Diaz* (2015) 60 Cal.4th 1176, 1187, italics added; see CALCRIM No. 358.) Even so, defendant fails to establish any impact on his substantial rights.[20] (§ 1259.) Any "caution" on the jury's part regarding Banks's testimony would not have affected the verdict. Defendant himself repeatedly said in his police statement that he did not want to kill McDade. Moreover, Terry Hodges's account of the crime, as related by Daryl Leisey, clearly portrayed defendant as a reluctant shooter. It included no statement by defendant.

e. *CALJIC No. 3.16*

The court asked defense counsel whether he preferred CALJIC No. 3.16, which would tell the jury the Hodges brothers were accomplices as a matter of law, or CALJIC No. 3.19, which would leave that determination for the jury. Counsel asked for the former, while the prosecutor favored the latter. The court gave CALJIC No. 3.16, which said that "[i]f the crimes of robbery or murder . . .

---

[20] He relies on the due process clause of the Fourteenth Amendment, his right to a jury trial under the Sixth Amendment, and his right to a reliable penalty determination under the Eighth Amendment.

were committed by anyone, Terry and John Hodges were accomplices as a matter of law and the statements of each to the extent they incriminate Carl Powell are subject to the rule requiring corroboration." Defendant contends this instruction improperly led the jury to view him as the direct perpetrator.[21] This asserted error was invited by his counsel's own request. (*People v. Harris* (2008) 43 Cal.4th 1269, 1293 (*Harris*).) In any event, defendant fails to show any impact on his substantial rights. (§ 1259.) The instruction was entirely consistent with the defense theory that the Hodges brothers pressured defendant into shooting McDade. Defendant now claims the jury could have credited the first version of events he gave to the police that he remained in the car while the brothers committed the crimes. No rational jury would have so concluded given defendant's subsequent confession and his statements to Littlejohn taking responsibility for the shooting.

### f. *CALJIC No. 8.81.17*

Without objection, the court instructed: "[T]o find that the special circumstance referred to in these instructions as murder in the commission of robbery is true it must be proved, one, the murder was committed while the defendant was engaged in the commission of a robbery, or, two, the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder." (See CALJIC No. 8.81.17.)

---

[21] He asserts his rights to a jury determination under the Sixth and Fourteenth Amendments and article I, sections 7, 15, and 16 of the state Constitution, and to a reliable penalty determination under the Eighth Amendment.

Defendant contends the use of the conjunctive "or" in the first sentence of this instruction allowed the jury to find the special circumstance true based on commission of the murder during the robbery, even if the robbery was merely incidental to the murder. He is correct that we have disapproved the use of "or" in this context. (*Harris*, *supra*, 43 Cal.4th at p. 1299.) However, he fails to show any impact on his substantial rights.[22] (§ 1259.) As in *Harris*, there was no evidence to support an inference that defendant killed McDade without the intent to steal. (*Harris*, at p. 1300; see pt. II.B.9, *ante*, pp. 35-38.) Defendant claims the jury could have found that he shot McDade out of frustration over not being rehired and only later decided to take the money. No objective view of the evidence supports such a theory. Neither the prosecution nor the defense advanced it. Multiple witnesses testified that defendant was contemplating a robbery before the shooting. In his statement to the police, defendant denied killing McDade because of his job situation and repeatedly acknowledged the robbery plan.

### g. *First Degree Murder Instruction*

Defendant contends it was improper to instruct the jury on first degree murder because the information charged him with murder "in violation of section 187," which he claims pertains only to second degree murder.[23] No such

---

[22]    Defendant invokes his rights to a jury trial under the Sixth Amendment, to due process under the Fourteenth Amendment, and to a reliable penalty determination under the Eight Amendment.

[23]    Defendant claims violation of his rights to due process under the Fourteenth Amendment and article I, sections 7 and 15 of the state Constitution, to a jury trial under the Sixth and Fourteenth Amendments and article I, sections 7, 15, and 16 of the state Constitution, and to reliable guilt and penalty determinations under the Eighth and Fourteenth Amendments and article I, section 17 of the state Constitution.

objection was raised below. As defendant acknowledges, we have repeatedly rejected this argument and the claim that it is supported by *Apprendi v. New Jersey* (2000) 530 U.S. 466. (E.g., *People v. Moore* (2011) 51 Cal.4th 386, 412-413; *Harris*, *supra*, 43 Cal.4th at pp. 1294-1295; *People v. Morgan* (2007) 42 Cal.4th 593, 616-617.) Defendant fails to persuade us to change our view.

11. *The Prosecutor's Guilt Phase Closing Argument*

Defendant claims the prosecutor committed misconduct during closing argument on a number of occasions.[24] He objected only once, however. Accordingly, the rest of defendant's claims of prosecutorial misconduct have been forfeited. "To preserve such a claim for appeal, 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " (*People v. Clark* (2011) 52 Cal.4th 856, 960.) The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm. (*Ibid.*; see *People v. Hill* (1998) 17 Cal.4th 800, 820.) Here, there is no merit in defendant's argument that the court's ruling on his single objection rendered it futile for him to object again.

The objection was lodged when the prosecutor said "witnesses were able to be manipulated by the defense attorneys with these leading type questions." The court overruled it, telling defense counsel "this is argument; you can respond to it in your argument." Nothing in this exchange suggested that objections to other arguments would have been futile. Nor was the prosecutor's remark improper. It is fair comment to argue that witnesses were confused or misled. " 'A prosecutor's misconduct violates the Fourteenth Amendment to the United States

---

[24] Defendant recites the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." [Citations.]' ([]*Cole*, *supra*, 33 Cal.4th at p. 1202; accord, *People v. Redd* [(2010)] 48 Cal.4th [691,] 733–734.)" (*People v. Clark*, *supra*, 52 Cal.4th at p. 960 (*Clark*).) Here, the "manipulation" remark fell far short of fundamental unfairness or deception.

With respect to defendant's other claims, there was no prejudicial misconduct, as his counsel's silence would suggest. Defendant complains that the prosecutor denigrated defense counsel by calling their theory of the case "the Svengali defense." This description, however, logically referred to the claim that the Hodges brothers forced defendant to shoot McDade. Defendant also objects to an assertion that defense counsel "doesn't care about a just verdict. He cares about the defense of his client, which he's supposed to. That's his professional duty. But don't buy for a second that he just wants a just verdict." It is not misconduct to comment on the role of defense counsel as an advocate. (See *People v. Gionis* (1995) 9 Cal.4th 1196, 1216-1218.) In any event, there was no likelihood of prejudice to defendant. (See *People v. Fierro* (1991) 1 Cal.4th 173, 212-213.)

Defendant contends the prosecutor made various improper statements of personal belief. None of the examples he cites were remotely objectionable, save one: "Carl Powell is a cold-blooded murderer. That's what Carl Powell is, and that's what I think he is." " 'We have held [that a prosecutor] may not express a personal belief in defendant's guilt, in part because of the danger that jurors may

45

assume there is other evidence at his command on which he bases this conclusion.' " (*People v. Sandoval* (1992) 4 Cal.4th 155, 183.)  No prejudice appears on this record.  The prosecutor's statement of belief was made in passing in the context of urging what the evidence showed.  Accordingly, the jury was unlikely to have understood the comment as referencing evidence beyond the record.

Defendant claims the prosecutor made an improper emotional appeal to the jury when he questioned the supportiveness of defendant's family.  These comments came in response to defense counsel's argument that defendant feared the Hodges brothers because they posed a threat to his family.  The prosecutor's statements may not have been particularly logical or persuasive, but they were hardly likely to provoke an irrational, purely subjective response from the jury. (See *People v. Redd*, *supra*, 48 Cal.4th at p. 742.)

Defendant also faults the prosecutor for emphasizing defendant's lack of remorse, based on Banks's testimony about a conversation with John Hodges and Littlejohn's account of her conversations with defendant.  We have said that "unless a defendant opens the door to the matter in his or her case-in-chief (*People v. Clark* (1993) 5 Cal.4th 950, 1016), his or her remorse is irrelevant at the guilt phase." (*People v. Jones* (1998) 17 Cal.4th 279, 307; accord, *People v. Riggs* (2008) 44 Cal.4th 248, 301.)  Here, the theory of the defense was that defendant did not want to shoot McDade but was pressured into doing so by the Hodges brothers.  Evidence that he displayed no remorse in the aftermath of the killing was relevant to rebut that theory.

12. *Jury Misconduct Claim*

After the Hodges brothers' mistrials, the court told the jury there might be media reports about the case, adding, "all I can do is ask you to continue to be

46

mindful of avoiding any contact with any of the news reports about any of the cases and not speculate also as to the status of the case against Terry and John Hodges." Several days later, defense counsel noted that the mistrials were reported in the Sacramento Bee on August 27. He requested an inquiry to the jury and an admonition that the article "is of no relevance in our situation." The prosecutor agreed. Defense counsel added, "I would anticipate the vast majority [of the jurors], when they saw the headlines in the paper as before, just quit right there, but . . . ." The court suggested asking the jurors if they could give their assurance that the article would not affect their deliberations and, if any said it might, following up with questions outside the presence of the other jurors. Defense counsel agreed.

When the jurors came in, the court asked whether any of them had seen "the short article" or the headline in the newspaper on Saturday concerning the charges against the Hodges. It asked for a show of hands. One juror responded "title." Six jurors and two alternates raised their hands. The court then asked if the article or headline would in any way affect their deliberations. No hands were raised, nor did any juror respond when the court inquired, "if I were to direct you to disregard what you've read in either the headline or the article, are there any of you that feel you would have any problem disregarding any of . . . that in making your decision in this case?" The court asked if counsel were satisfied or if they wanted any further inquiry. Defense counsel replied, "no, I think that's appropriate, your Honor; that's fine."

After deliberations began, counsel advised the court that defendant wanted to know if the jury would be questioned about another article in the Sacramento Bee. Counsel noted that the jury had been advised about the August 27 article but that on August 24 a similar article discussing the mistrials had appeared. Counsel added, "my feeling is that . . . the court's inquiry on the last one it would probably

47

cover both of them. Maybe [the] court has different feelings on that." The court pointed out that its last advisement had been specific to the August 27 article. Defense counsel explained, "the reason I said that is I heard several of them say yeah. We saw the caption. But that's where we stopped. . . . I think that — from what several said I assume maybe they were doing the same thing with the previous articles."

The court noted that there had been no further inquiry on the August 27 article because defense counsel were satisfied with simply asking how many jurors had seen the article and the headline without going into the content of the article. Counsel observed that the August 24 article might be more damaging to the defense than the August 27 article because it included some comments from jurors in the Hodges brothers' case. Counsel were uncertain as to how or even whether to make an inquiry while the jury was deliberating. Ultimately, they agreed with the court's suggestion that it send the jury a written question, asking simply if they had seen the August 24 article and, if so, would they have any difficulty disregarding it. When the court asked if there had been any other articles, counsel pointed out that there had been others that had been brought up, but no request was made to include those in the query. Counsel expressly approved the court's proposal, saying, "that sounds good — just the way you said it." Five jurors responded they had read the August 24 article or its headline. None indicated they would be unable to disregard whatever they had read.

Defendant claims it was misconduct for jurors to have read the articles.[25] However, the record does not show that any juror actually read either article.

---

[25] He relies on his rights to an impartial jury under the Fourteenth Amendment and article I, sections 7, 16, and 17 of the state Constitution, and to a reliable penalty determination under the Eighth Amendment.

48

Indeed, defense counsel stated their belief that the jurors who said they saw the articles had probably stopped reading after the headlines, as they had become accustomed to doing throughout the trial. Accordingly, defendant fails at the outset to show any misconduct. He further contends the court's inquiry was inadequate. That claim has been forfeited by counsel's approval of the court's approach and failure to seek any broader investigation. (*People v. Holloway* (2004) 33 Cal.4th 96, 126-127 (*Holloway*).) In any event, no prejudice appears. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 192.) The jury clearly understood that the articles were not to be considered during deliberations. Even if it could be inferred that any juror read one or both of them, neither article is part of the record. Thus, there is no basis to conclude that the articles affected the verdict.

C. *Penalty Phase Issues*

1. *Restrictions on Testimony of Defense Expert*

In his penalty phase opening statement, defense counsel said the jury would hear from a psychologist, Larry Nicholas. The prosecutor objected when counsel began detailing what defendant told Nicholas about the murder. The court excused the jury and heard argument. Counsel said Nicholas would report a version of events similar to the testimony the prosecutor had told the jury it would hear from defendant himself at the guilt phase: Defendant had approached McDade to talk about his job, then the Hodges brothers walked up, announced a robbery, gave defendant a gun, and pressured him into shooting McDade.

Counsel contended this testimony was relevant to mitigation. The prosecutor argued that he would be deprived of his ability to cross-examine defendant if the defense presented his story through Nicholas's testimony and that such testimony would significantly enhance the testimony of Leisey and Banks, which tended to shift blame to the Hodges brothers. The court observed it could

49

instruct the jury not to consider defendant's statements for their truth but only as the basis for the doctor's opinion. The prosecutor was skeptical the jury would be able to make that distinction. The court asked defense counsel whether he could limit the doctor's description by simply having him testify that defendant gave him a version of the events similar to the evidence the jury had heard during the guilt phase. Counsel responded that defendant's credibility during his interview with the doctor was a critical issue, and he wanted the doctor's opinion on defendant's credibility to be clearly based on defendant's statements.

The prosecutor objected to Nicholas vouching for defendant's credibility. Defense counsel agreed this would have been improper at the guilt phase but argued that he was entitled to elicit lingering doubt during the penalty phase. The court asked for the psychologist's report and said it would conduct research during the noon recess. It ultimately sustained the prosecutor's objection, ruling that defendant's statements to Nicholas were inadmissible hearsay. Subsequently, the court explained that its ruling was based on *People v. Coleman* (1985) 38 Cal.3d 69 (*Coleman*) and *People v. Price* (1991) 1 Cal.4th 324 (*Price*). It drew from these cases the rule that "otherwise inadmissible hearsay that prejudices one side" cannot be presented through expert testimony. The court said Nicholas could be asked hypothetical questions based on the evidence presented to the jury. What he could not do was "give a self-serving albeit somewhat incriminating and somewhat exonerating statement of an out-of-court declarant."

Defendant claims the court erred by reading *Coleman* and *Price* as requiring the automatic exclusion of hearsay statements from expert testimony if

50

no exception applies.[26]  He relies on the proposition that experts may rely on statements that would otherwise be hearsay in forming their opinions because the statements are not being offered for their truth.  (*People v. Montiel* (1993) 5 Cal.4th 877, 918; *Coleman*, *supra*, 38 Cal.3d at p. 92.)[27]  Defendant mischaracterizes the trial court's reasoning.  The court applied no rigid rule of exclusion but made clear its view that, under *Coleman* and *Price*, it had discretion to exclude matters relied upon by an expert if their content was unduly prejudicial.  At one point, the court noted that the error in *Coleman* was that "the trial judge should have exercised discretion to disallow that prejudicial content from being utilized in cross examination of the doctor."  (See *Coleman*, at p. 93; *Price*, *supra*, 1 Cal.4th at p. 416 ["A trial court has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay"]; see also *People v. Pollock* (2004) 32 Cal.4th 1153, 1172 ["Although an expert may base an opinion on hearsay, the trial court may exclude from the expert's testimony 'any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value' "]; *People v. Carpenter* (1997) 15 Cal.4th 312, 403 [prejudice may arise if, under the guise of

---

**26**    He refers to his rights to due process under the Fifth and Fourteenth Amendments, to present a defense under the Sixth Amendment, and to a reliable penalty determination under the Eighth Amendment.

**27**    Defendant does not rely on *Green v. Georgia* (1979) 442 U.S. 95, which held that even if certain penalty phase evidence was barred by state hearsay rules, due process required its admission when it was "highly relevant to a critical issue in the punishment phase of the trial" and "substantial reasons existed to assume its reliability." (*Id*. at p. 97.)  We have noted that *Green* applies only to evidence having " 'special indicia of reliability.' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 150, quoting *People v. Weaver*, *supra*, 26 Cal.4th at p. 981.)  As discussed *post*, defendant's statements to Nicholas bore no such indicia.

reasons, an expert's detailed explanation presents the jury with incompetent hearsay evidence].)

We have recently clarified the law in this area, holding that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686 (*Sanchez*).) We disapproved a number of cases, including *Coleman*, *supra*, 38 Cal.3d 69, to the extent they held that a limiting instruction and a trial court's evaluation of the prejudicial impact of such statements may sufficiently address the hearsay and confrontation problems. (*Sanchez*, at p. 686, fn. 13.) Here, because the trial court excluded defendant's statements to Nicholas, no such problems arose. Moreover, the court's ruling was fully consistent with *Sanchez*, under which defendant's statements were inadmissible as "[c]ase-specific facts . . . relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.)

In this case, the version of events defense counsel wanted to introduce through Nicholas's testimony was significantly more exculpatory than the versions properly admitted into evidence, including those defendant himself provided in his police interview. Defense counsel made plain his intent to use the doctor to enhance *defendant's* credibility, making it clear that defendant's self-serving statements were being offered for their truth. Thus, they were "incompetent hearsay evidence." (*Coleman*, *supra*, 38 Cal.3d at p. 92.) The court did not abuse its discretion by excluding defendant's self-serving account to Nichols.

2. *Gang Evidence*

Defendant challenges the admission of two forms of gang evidence in the penalty phase. The first was a photograph of him and William Akens taken in

52

November 1991.  It shows them pointing guns at each other and curling their free hands into a "C" shape, standing for "Crips."  The second was testimony from a gang unit detective that defendant had a reputation as a "main player" in the Crips.[28]

During an in limine discussion of penalty phase evidence, the court ruled that the photograph did not qualify as evidence of a threat of violence for purposes of the aggravating factor set out in section 190.3, subdivision (b).  However, the court noted that gang evidence would be admissible in connection with any violent conduct by defendant that was gang-related.  Akens testified for the prosecution at the penalty phase.  He identified himself as a Freeport Crip but was evasive about defendant's gang membership.  He said his association with defendant "wasn't about a gang; it was about who had each other's back."  Akens acknowledged that defendant had been a Crip when he was in Los Angeles but said he did not "look at him as a Crip," and refused to identify him as a Freeport Crip.  Akens testified that in the fall of 1991, defendant had remained outside when Akens entered a high school classroom and confronted Zeke Moten, a student who had left the Crips and joined the Bloods.  The teacher in the room, however, testified that defendant had entered with Akens and also threatened Moten.

Akens testified that as he and defendant drove by the high school some days later, they saw Moten at a bus stop with other people.  Moten's group shot at their car, so they returned fire.  Akens said defendant had been a shooter.  However, on cross-examination, he insisted he had not seen defendant shoot and was only told about it later.  On redirect, he conceded he had told a police officer that defendant was the shooter but said he was on medication at the time and was

_____

[28]    Defendant relies on his rights to due process under the Fourteenth Amendment and to a reliable penalty determination under the Eighth Amendment.

only relating an assumption. Akens claimed he did not know if defendant owned a gun at that time but admitted he had taken "some pictures" with defendant in which they both had guns. He repeated that he did not know whether defendant had been armed during the bus stop shooting or had fired any shots.

The prosecutor called Ronald Aurich, a detective who questioned Akens after the shooting. Aurich had been a gang detective from 1984 until 1994. He said Akens had identified defendant as the shooter. The defense objected, unsuccessfully, when the prosecutor asked about the dispute that led to the shooting. Aurich said that, according to Akens, the dispute had been between defendant and a person named Andre Whitaker. The prosecutor asked if Aurich recognized defendant's name. When the defense objected, the court restricted the question to the issue of defendant's reputation. Aurich said defendant had a reputation as a "Freeport Crip and was a main player."

The prosecutor moved to admit the picture of Akens and defendant. The defense argued that after Akens's testimony, there was no doubt he and defendant were Crips, so the photograph was cumulative. Counsel also claimed it was inflammatory, because it suggested defendant and Akens "were on some sort of a[n] endless trail of crime." The court ruled the photograph was relevant to show defendant's gang membership and not unduly prejudicial. The court noted that the thrust of the penalty phase defense was that defendant only committed the crime because of the Hodges brothers' influence. The photograph indicated that defendant had "considered doing such a thing previously," even if he was joking when holding the gun to Akens's head.

Defendant renews his arguments on appeal. The photograph, however, was neither cumulative nor prejudicial. Akens did not identify defendant as a Freeport Crip during his testimony. Although Detective Aurich testified to defendant's reputation as a Freeport Crip and Nicholas testified for the defense that defendant

54

continued his association with the Crips after moving to Sacramento, the prosecutor was not required to rest his case on such attenuated sources. Further, the photograph was admitted in rebuttal after defendant attempted to minimize his gang involvement. His gang membership was directly relevant to his participation in the classroom incident and drive-by shooting, which were gang-related. It was also relevant to another assault against a rival gang member, Harold Rigsby, who testified at the penalty phase. Additionally, the photograph shows defendant in possession of a gun around the time of the drive-by shooting, something Akens was not willing to confirm. The court did not abuse its discretion.

Defendant claims there was insufficient foundation for Detective Aurich's testimony that he was reputed to be a "main player" in the Freeport Crips. In a supplemental brief, defendant argues the testimony improperly conveyed hearsay and violated confrontation principles, relying on *Sanchez*, which concluded that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez, supra,* 63 Cal.4th at p. 686, fn. omitted.)

Initially, the Attorney General argues defendant forfeited his claim because he raised no hearsay or confrontation objection to Aurich's testimony, nor did he challenge the evidence as improper reputation testimony. We agree under the present circumstances. Defense counsel objected on grounds of "relevance" and "one of your prior rulings as well," an apparent reference to the court's pretrial ruling against the admission of gang-related evidence unless incidents of gang

55

violence were at issue. On cross-examination, counsel explored the basis for Aurich's assessment of defendant's reputation but did not move to strike his testimony.

It is true that *Sanchez* postdated the trial here. However, *Sanchez* would only excuse a lack of objection if an objection would have otherwise been futile under prior law. The issue in *Sanchez* was whether an *expert* may properly relate to the jury out-of-court statements to explain the bases for the expert's opinion testimony. Pre-*Sanchez* law characterized such statements as nonhearsay, reasoning that "matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth." (*People v. Montiel, supra,* 5 Cal.4th at p. 919; see *Coleman, supra,* 38 Cal.3d at p. 92.) As such, a hearsay objection to such expert testimony would generally have been futile unless it was shown that the jury could not "properly follow the court's limiting instruction in light of the nature and amount of the out-of-court statements admitted." (*Sanchez, supra,* 63 Cal.4th at p. 679.)

Here, however, Aurich did not testify as an expert. Aurich initially testified regarding his interview of Akens. He was then asked about defendant's reputation for gang activity, whereupon he testified he "was receiving" information that defendant was a "Freeport Crip and was a main player," explaining the latter phrase. Aurich was not testifying as an expert by conveying his *own* opinion about defendant's gang activity or offering hearsay in support of such an opinion. Rather, he was relating what he had been told about defendant's gang activity. (Cf. *People v. Jones* (2017) 3 Cal.5th 583, 603, fn. 4.) Whether such testimony fell within the ambit of the hearsay exception for reputation concerning character (Evid. Code, § 1324) or otherwise violated the right of confrontation, the bases for challenging it predated *Sanchez.* (See, e.g., *People v. Eli* (1967) 66 Cal.2d 63, 78-80 [finding error in the admission of reputation evidence].) As such, defendant's

56

failure to object forfeited his claims. (See *People v. Abel* (2012) 53 Cal.4th 891, 924.)

In any event, even assuming error, the admission of the "main player" statement was harmless beyond a reasonable doubt. As the Attorney General observes, evidence was presented at the penalty phase of defendant's involvement, along with Akens, in a shooting of a rival gang member. Additionally, evidence reflected that defendant had been a gang member since he was 12 years old and continued his involvement in the Crips when he moved to Sacramento at age 16. A photo depicted defendant and Akens holding guns and displaying gang signs. Aurich described "main players" as "a little more hardcore, gang members who promote their gang, be involved in gang activity, be involved in gang related type crimes, be a little more blatant about who they are and what they do." The evidence already reflected defendant's significant gang involvement without Aurich's shorthand characterization. (Cf. *People v. Banks* (2014) 59 Cal.4th 1113, 1199 [improper reputation evidence harmless].)

### 3. *Victim Impact Evidence*

Edwina Pama, Colleen McDade's mother, testified about the impacts of the murder on the McDade family. After she spoke about Colleen and the two McDade children, the prosecutor asked her about Keith's mother and siblings. Defense counsel objected, stating he had been "holding back on my objections," but argued that "if counsel wants to ask one witness about the effects on another, I suggest he bring the other witness in." The court overruled the objection "to the extent that the witness may describe things she has perceived as opposed to opinions she has otherwise."

Pama said the murder had been "very, very hard" on Keith's mother. "At first it seemed like she didn't want to talk about Keith. To me it was like, you

57

know . . . if you don't say anything about it, it will go away." Defense counsel renewed his objection, asking that the testimony be struck and that questioning be restricted to what the witness had seen or heard. The court again overruled the objection, stating that Pama could give her "lay opinion" "as to what she actually perceived and what she believed concerning those perceptions." Counsel objected again when the prosecutor asked how Keith's murder had affected his brother. The court sustained this objection, telling the prosecutor to restate the question so as to focus on "what she has perceived other than what she may know from any other hearsay source."

Defendant challenges these rulings.[29] First, he claims Pama's testimony should have been excluded as improper lay opinion. He cites *People v. Chatman* (2006) 38 Cal.4th 344, 397 for the proposition that "[g]enerally, a lay witness may not give an opinion about another's state of mind." But as the *Chatman* court continued to say, "a witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*Ibid*.) There, a penalty phase witness testified that he had seen the defendant kicking a school custodian. The prosecutor asked whether the defendant " 'seemed to be enjoying it.' " (*Ibid*.) The witness's affirmative answer was held to be proper. Similarly here, Pama was qualified to testify about her own direct perceptions of how McDade family members reacted to the murder. The trial court's responses to the objections made plain to the jury and the witness what the proper scope of her testimony was. Defendant's attempt to parse the record for examples of Pama's projection of her own feelings is not persuasive. Any defects in the testimony in this regard were merely semantic and cannot be deemed prejudicial.

---

[29] He claims violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Defendant further contends that Pama's testimony was so inflammatory as to invite an irrational, purely subjective response from the jury. (See *Payne v. Tennessee* (1991) 501 U.S. 808, 824-825; *People v. Edwards* (1991) 54 Cal.3d 787, 835-836.) As defendant concedes, he failed to raise such an objection below, forfeiting this claim. (*People v. Simon* (2016) 1 Cal.5th 98, 139 (*Simon*).) What we said recently in *Simon* also applies here: "Even if [the] claim were not forfeited, his argument fails on the merits because the victim impact evidence was not unduly prejudicial. The family members' testimony here properly described the nature of their relationships with the victims, how they learned about the crimes, and how the crimes impacted their lives. [Citations.] Furthermore, neither the number of witnesses . . . nor the amount of testimony . . . was excessive." (*Id.* at pp. 139-140, citing *People v. Romero and Self* (2015) 62 Cal.4th 1, 46 [no error where victim impact testimony consisted of six witnesses spanning 96 pages of the reporter's transcript]; *People v. Pearson* (2013) 56 Cal.4th 393, 464–467 [victim impact testimony of 13 witnesses]; *People v. Nelson* (2011) 51 Cal.4th 198, 219–221 [victim impact testimony of one victim's six family members].)

"Moreover, the content of the victim impact evidence was not so emotional that it became unduly prejudicial. [Defendant] is likely correct that the testimony painted a picture of 'the complete devastation of two families,' but that is to be expected when loved ones have been brutally murdered. [Citations.] The question is not simply whether victim impact evidence was emotional or demonstrated the devastating effect of the crime; rather, it is whether the testimony invited an irrational response from the jury. [Citation.] [Defendant], however, provides no persuasive basis for us to conclude that the testimony presented in this case triggered such a response. And our review of the record indicates the testimony was not so emotional that the trial court's failure to exclude it amounted to an

abuse of discretion or rendered [the] trial fundamentally unfair." (*Simon*, *supra*, 1 Cal.5th at p. 140.)

### 4. *The Prosecutor's Penalty Phase Closing Argument*

Defendant argues, at great length, that the prosecutor committed misconduct during his penalty phase argument.[30]  No objection was made below. As noted, a claim of prosecutorial misconduct is forfeited when there was neither a timely and specific objection nor a request for admonition.  (*Clark*, *supra*, 52 Cal.4th at p. 960.)  Defendant refers to the court's rejection of his single objection to a *guilt* phase argument when the prosecutor asserted that "witnesses were able to be manipulated by the defense attorneys with these leading type questions." (See pt. II.B.11, *ante*, pp. 44-45.)  On this basis, he asserts that any objections at the penalty phase would have been futile.  The claim is meritless.  Nor do we accept defendant's contention that the effects of the prosecutor's misconduct could not have been cured by admonition.  None of the alleged instances of misconduct were so provocative that an advisement would have been ineffective, assuming one were called for.

Although defendant's claims are forfeited, we address them in summary fashion.  Defendant contends the prosecutor's comments comparing him to a Bengal tiger constituted a "thinly-veiled racist allusion" that dehumanized him and thus constituted an improper argument regarding his future dangerousness.  We have previously rejected claims based on similar comments and find no ground to reach a different result here.  (See *People v. Brady* (2010) 50 Cal.4th 547, 585; *People v. Duncan* (1991) 53 Cal.3d 955, 976-977.)  It goes without saying that a

---

[30]     He asserts violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

prosecutor may not compare a defendant to a beast for the purpose of dehumanizing him before the jury or in an effort to evoke the jury's racial biases. The prosecutor may, however, properly remind a penalty phase jury of the circumstances of the offense, including the brutality of the murder, and caution the jury against judging defendant solely based upon his calm demeanor in the courtroom. Here, as in our prior cases, the record makes clear that the prosecutor was using the Bengal tiger analogy only to make the latter point. Under the circumstances of the case, we find no prejudicial misconduct.

Defendant acknowledges that, under our precedent, the prosecutor could urge the jury to give him the same degree of sympathy he gave to McDade. (E.g., *People v. Collins*, *supra*, 49 Cal.4th at p. 230; *People v. Ochoa* (1998) 19 Cal.4th 353, 464-465.) He does not persuade us to change our view. Similarly, we decline to overrule our cases holding that the jury may be asked to consider the crime from the victim's point of view. (E.g., *People v. Scott* (1997) 15 Cal.4th 1188, 1220; *People v. Garceau* (1993) 6 Cal.4th 140, 206.) The prosecutor's arguments here were based on reasonable inferences from the evidence about the circumstances of the shooting. The evidence also supported the prosecutor's observation that defendant could have killed someone when he fired at the crowd around the bus stop. In general, the prosecutor's use of the aggravating evidence of defendant's gang activity was proper.

"The prosecutor is entitled to note the absence of the mitigating circumstance of remorse. . . ." (*Burney*, *supra*, 47 Cal.4th. at p. 266.) To the extent the prosecutor's arguments here could have been construed by the jury to employ defendant's lack of remorse as an aggravating factor, such a misapplication could easily have been remedied by the court if an objection were made. (See *People v. Jurado* (2006) 38 Cal.4th 72, 141.)

61

The prosecutor's comments on defendant's supportive family were not an improper use of extenuating circumstance evidence under section 190.3, subdivision (k). (See *People v. Caro* (1988) 46 Cal.3d 1035, 1062-1063.)

"Although it is misconduct to misstate facts, the prosecutor 'enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom.' " (*People v. Collins*, *supra*, 49 Cal.4th at p. 230.) Here, the prosecutor did not materially misrepresent the evidence of defendant's relationship with the McDades or Nicholas's testimony regarding whether defendant was pressured into shooting Keith. His comments with respect to whether the Hodges brothers were present at the moment of the shooting were based on defendant's own statements to the police. Any misstatement could easily have been corrected by the court upon timely objection. Further, the jury was told to determine the facts from the evidence and not from the arguments of counsel.

The Attorney General concedes the evidence did not support the prosecutor's argument that William Akens was on probation, giving him an incentive to testify truthfully. However, defense counsel made no effort to correct the mistake. The record shows that Akens was, in fact, on parole from the California Youth Authority (now the Division of Juvenile Justice), though the jury was not informed of this. However, the jury heard evidence that Akens had just been released from the custody. Defendant was not prejudiced by the prosecutor's misstatement.

Defendant asserts the prosecutor denigrated defense counsel by claiming they were trying to shift blame to the Hodges brothers. That was the essence of the defense strategy. The argument was a proper comment on this tactic. (See, e.g., *People v. Seaton* (2001) 26 Cal.4th 598, 663; *People v. Bemore* (2000) 22 Cal.4th 809, 846.) Defendant also contends the prosecutor improperly attacked the credibility of Nicholas, claiming he was "bought and paid for" and disputing

his assessment of defendant's IQ.  The prosecutor's remarks were not improper.  (See *Clark*, *supra*, 52 Cal.4th at p. 962 ["our decisions make clear that 'harsh and colorful attacks on the credibility of opposing witnesses are permissible' "]; *People v. Arias* (1996) 13 Cal.4th 92, 162 [argument that defense expert " 'stretch[ed]' " a principle " 'for a buck' " was permissible comment suggesting a paid witness may be biased].)

Finally, defendant claims the prosecutor improperly invoked biblical authority when he argued, "If you make certain choices in your life theology-wise you go to hell.  If you make other certain choices in your life, you go to heaven.  That's the way it is."  "As we have explained, '[t]he primary vice in referring to the Bible and other religious authority is that such argument may "diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions." ' " (*People v. Hughes* (2002) 27 Cal.4th 287, 389.)  Any possible misconduct was harmless.  These comments came in response to the defense argument that the Hodges brothers made defendant shoot McDade, in an effort to persuade the jury to hold him responsible for his actions.  The prosecutor did not urge the jury to apply a source of law other than the court's instructions.  (See *People v. Huggins* (2006) 38 Cal.4th 175, 208.)

5. *News of an Unrelated Case*

After the jury announced it had reached a penalty verdict, but before it was brought in to announce it, defense counsel commented, "I'm sure we've all read [about] the incident that happened here the other day, the McDonald's on Florin Road, the shooting and probably some gang relationship to that as well.  What I'm thinking is, that perhaps the Court might make some inquiry whether the jurors have, number one, have they read that article, and if they did, whether it

63

influenced them in any way?  And however the Court wants to handle that, I would leave it up to you."  Counsel observed that the coverage of this incident occurred during the arguments and continued during the jury's deliberations.  Counsel agreed with the court's suggestion that it question the jury as a panel rather than individually.  Counsel further agreed with the prosecutor that the inquiry take place after the jury disclosed its verdict.

After the verdict was entered, the court asked the panel, "Which, if any of you, were exposed to any of the news reports . . . of the recent McDonald's fast-food robbery-murder case?  Were there any of the deliberating jurors who heard or read any of those reports?"  Only two jurors were unaware of the incident.  The court asked, "those who did receive any information about that, were there any of you that were influenced in your decision by any of the news reports concerning that?"  No juror gave a positive response.

Defendant contends the court conducted an inadequate inquiry into jury misconduct.[31]  However, defense counsel fully acquiesced in the court's approach and made no request for further inquiry, forfeiting any claim of error.  (Cf. *Holloway*, *supra*, 33 Cal.4th at pp. 126-127.)  In any event, the claim is unfounded.  The court need not have conducted any inquiry at all.  We have held that the effects of a jury's exposure to coverage of other crimes is too speculative to require investigation by the court.  (*Clark*, *supra*, 52 Cal.4th at pp. 966-967, and cases therein cited.)

---

[31]  He invokes his fair trial rights under the Sixth and Fourteenth Amendments and article I, sections 7, 15, and 16 of the state Constitution, as well as his right to a reliable penalty determination under the Eighth Amendment.

### 6. *Refusal of Instructions Proposed by the Defense*

#### a. *Victim Impact Evidence*

The court declined to give the following instruction proposed by the defense: "Evidence has been introduced for the purpose of showing the specific harm caused by the defendant's crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy." We have rejected claims of error based on the refusal to give this instruction or to instruct sua sponte on the proper use of mitigating evidence. (*People v. Russell* (2010) 50 Cal.4th 1228, 1265-1266; *Carey*, *supra*, 41 Cal.4th at p. 134.) We do so again here.[32] The jury was adequately instructed with CALJIC Nos. 8.84.1 and 8.85.

#### b. *Mitigating Evidence*

Defendant contends the court erred by failing to give several proposed instructions with regard to mitigating evidence.[33] First, he challenges the rejection of an instruction stating: "If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty. A mitigating factor does not have to

---

[32] Defendant refers to the Sixth, Eighth, and Fourteenth Amendments and article I, sections 7, 15, 16, and 17 of the state Constitution.

[33] He claims violations of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and article I, sections 7 and 15 of the state Constitution.

be proved beyond a reasonable doubt. A juror may find that a mitigating circumstance exists if there is any evidence to support it no matter how weak the evidence is." The court did instruct the jury that mitigating factors need not be proven beyond a reasonable doubt and that a mitigating factor may be found to exist "if there is any credible evidence to support it." The court's instructions on this point, together with the standard CALJIC instructions on mitigation evidence, were entirely sufficient. (CALJIC Nos. 8.85 & 8.88.) We have rejected claims that the jury must be told that sympathy or compassion alone may justify rejection of the death penalty. (*People v. Davis* (2009) 46 Cal.4th 539, 621-622; *People v. Loker* (2008) 44 Cal.4th 691, 744.) We have also held that the court has no duty to instruct the jury that it may find a mitigating circumstance if there is "any evidence to support it." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1069.)

Defendant also asked for the following instruction on mental impairment: "The mental impairment referred to in this instruction is not limited to evidence which excuses the crime or reduces defendant's culpability, but includes any degree of mental defect, disease or intoxication which the jury determines is of a nature that death should not be imposed. That the jury has rejected a defense of insanity, diminished capacity or diminished actuality at a previous stage of the proceedings does not prohibit its consideration of evidence showing some impairment as a reason not to impose death." The court declined to give this instruction, saying it would instead modify CALJIC No. 8.85, factor (i) to permit the jury to consider defendant's "*chronological or psychological* age at the time of the crime." (Italics added.) Defense counsel said, "I think that's appropriate, your honor."

The court's instructions were adequate. The passage in defendant's proposed instruction regarding the defenses of insanity, diminished capacity, or diminished actuality were irrelevant. None of these defenses were presented to the

66

jury. CALJIC No. 8.85, factor (h) advised the jury that in deciding which penalty to impose, it must consider "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication." The portion of the proposed instruction that was not irrelevant was duplicative of this standard instruction.

Finally, defendant contends the court erred by refusing to instruct the jury that "[t]he mitigating circumstances that I have read for your consideration are given merely as examples of some of the factors that a jury may take into account as reasons for deciding not to impose a death sentence in this case. A juror should pay careful attention to each of those factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But a juror should not limit his or her consideration of mitigating circumstances to these specific factors. . . . Any mitigating circumstance may outweigh all the aggravating factors."

The court decided these instructions were duplicative of CALJIC No. 8.85, factor (k), which required the jury to consider: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. . . ." The court also referred to the portion of CALJIC No. 8.88 that instructed the jury, "you are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." The latter instruction also told the jury that the weighing process is not "a mere mechanical counting of factors on one side of an imaginary scale, or the arbitrary assignment of weights to any of them." (*Ibid.*)

67

Defendant argues that the instructions given did not inform the jury that just one mitigating circumstance can be sufficient to justify a sentence of life without the possibility of parole. As he points out, we have approved instructions making that point. (E.g., *People v. Anderson* (2001) 25 Cal.4th 543, 599; *People v. Sanders* (1995) 11 Cal.4th 475, 557.) The Attorney General responds that we have never *required* such an instruction to be given and have held that "CALJIC No. 8.85 is both correct and adequate," and that "CALJIC No. 8.88 properly instructs the jury on its sentencing discretion and the nature of its deliberative process." (*People v. Valencia* (2008) 43 Cal.4th 268, 309, 310.) Here, the court did not abuse its discretion by relying on instructions that were standard at the time of trial. There is no constitutional requirement that the jury be told a single mitigating factor may be enough to support its decision. The court's instructions left ample room for counsel to argue that any one factor may be sufficient to justify life without the possibility of parole, and counsel pressed that point in his closing argument.

### 7. *Asserted Repetition of Guilt Phase Instructional Error*

Defendant contends the court repeated three guilt phase instructional errors at the penalty phase.[34] First, he claims he was prejudiced because the jury received a written copy of CALJIC No. 2.71.7, advising the jury to consider "an oral statement of [intent, plan, motive or design] . . . made by the defendant before the offense" with caution. There was no objection below, and defendant shows no impairment of a substantial right. (§ 1259.) He repeats the argument we have rejected in part II.B.10.d., *ante*, page 41: That the instruction improperly applied

---

[34] He asserts violation of his right to a reliable penalty determination under the Eighth and Fourteenth Amendments.

68

to John Hodges's statement, reported by Eric Banks, that defendant had said he did not want to kill McDade. Defendant argues that his penalty phase defense centered on the claim that he shot McDade only because he feared and felt pressure from the Hodges brothers. As we have noted, however, there is no reason to think that extra "caution" would have influenced the jurors' consideration of Banks's testimony. Defendant's own recorded statements to the police emphasized that he had not wanted to kill McDade, and Terry Hodges's description of the crime to Daryl Leisey conveyed the same impression.

Next, defendant contends the court should have given a duress instruction at the penalty phase. The court refused counsel's request for one, saying "there's no more evidence to support it than there was in the guilt phase." The court was correct. As discussed in part II.B.8, *ante*, pages 34-35, there was no guilt phase evidence supporting a conclusion that defendant shot McDade because of an imminent threat against his life. Defendant claims Nicholas's penalty phase testimony provided additional support. It did not. The psychologist's testimony merely tended to show that defendant was *susceptible* to manipulation and intimidation, not that there was any actual duress.

Finally, defendant argues that the court erroneously gave the jury a version of CALJIC No. 3.16 to the effect that the Hodges brothers and Akens were accomplices as a matter of law. No objection was made, and defendant cannot show that this instruction had an impact on his substantial rights at the penalty phase. (§ 1259.) For the reasons stated in part II.B.10.e., *ante*, pages 41-42, the instruction was helpful to the defense with regard to the Hodges brothers, and defendant's admissions left no doubt that they were accomplices, not perpetrators of the murder. Defendant contends Akens took responsibility for the threat against Moten in the classroom and the drive-by shooting, and, thus, the instruction erroneously cast defendant in the role of perpetrator. However, the accomplice

69

instruction would not have led the jury to believe that defendant was a perpetrator as a matter of law with respect to these incidents. To the contrary, the court modified the penalty phase instruction to state that the rule requiring corroboration of Akens's statements applied "to the extent they incriminate [defendant]." Thus, the instruction aided the defense.

### 8. *Denial of Automatic Modification Motion*

The trial court stated its reasons on the record for denying the motion for modification of the verdict mandated by section 190.4, subdivision (e). "In ruling on the application to modify, the trial court does not make an independent penalty determination, but instead reweighs the evidence of aggravating and mitigating circumstances and then determines whether the weight of the evidence supports the jury verdict." (*Wallace*, *supra*, 44 Cal.4th at p. 1096.) Here, the court primarily emphasized three circumstances: Defendant took advantage of his relationship with McDade, who had treated him with care and concern; defendant committed an execution-style murder knowing the impact it would have on a young family; and McDade himself was a relatively young man.

Defendant does not take issue with the court's reliance on these factors. Instead, he claims the court erred by giving aggravating weight to other factors that can only be mitigating and by failing to consider certain mitigating evidence.[35] The Attorney General concedes that the court erred by weighing in aggravation whether the victim was a participant in or consented to the homicide (§ 190.3, subd. (e)), and whether defendant reasonably believed his conduct was justified or extenuated (§ 190.3, subd. (f)). However, he urges the errors were

---

[35] Defendant cites his rights to a reliable penalty determination under the Eighth Amendment and to due process under the Fourteenth Amendments.

harmless as they were in *People v. Hamilton* (1989) 48 Cal.3d 1142, 1186-1187. We agree. As in *Hamilton*, the court stressed that the murder was "brutal and cold-blooded" (*id*. at p. 1186), "the mitigating evidence was comparatively weak" (*id*. at pp. 1186-1187), and "the court did not deem the issue of penalty to be a close on" (*id*. at p. 1187). A proper weighing of mitigating factor (e) and (f) evidence would not have led to leniency. The aggravating evidence on which the court placed primary and proper weight was substantial.

Defendant also claims the court gave improper aggravating effect to defendant's positive family atmosphere and support, which was extenuating evidence under factor (k). Not so. The court specifically stated that it was considering this evidence in mitigation, and its observation that defendant "should have been the product of a loving and caring family" is reasonably understood as a comment on the weight of this mitigating evidence. Defendant faults the court for not mentioning the environment of his youth in Los Angeles and the difficult circumstances his family faced there. Similarly, defendant complains that the court did not mention his positive personality traits. However, "[i]n ruling on an automatic motion to modify a death verdict, a trial court need not recount details of, or identify, all evidence presented in mitigation or in aggravation. [Citation.] The trial court's only obligation was to provide a ruling that allows effective appellate review. [Citation.] The trial court here did: It identified what it viewed as mitigating and aggravating evidence of significance to its ruling, and it engaged in the requisite weighing." (*People v. Romero* (2008) 44 Cal.4th 386, 427.)

Defendant further objects that the court refused to consider his youth as a mitigating factor. On this subject, the court said: "The age of the defendant at the time of the crime, that could in some jurors' or fact finders' minds be a mitigating factor because the defendant was relatively young at the time of the offense, but I don't find this to be of — the defendant's age at the time of the offense to

71

constitute a mitigating factor. At best, it's a neutral factor." These comments show that the court understood that a defendant's youth *can* be a mitigating factor. In reweighing the evidence before the jury, however, the court concluded that its impact was negligible. We note that the court was not required to find that evidence of youth was actually mitigating in light of all the evidence. (*Wallace*, *supra*, 44 Cal.4th at pp. 1095, 1097.) Defendant points out that the Eighth Amendment prohibits the execution of persons under the age of 18. (*Roper v. Simmons* (2005) 543 U.S. 551, 568 (*Roper*).) Therefore, he contends the circumstance that a capital defendant is only 18 years old at the time of the murder must *always* be considered mitigating. This conclusion does not flow from *Roper*'s reasoning, which recognized that 18 is necessarily a somewhat arbitrary line to draw, given human variability. (*Id*. at p. 574.)

In any event, our review of the trial court's ruling is independent. (*Wallace*, *supra*, 44 Cal.4th at p. 1096.) Considering all the evidence before the jury, including defendant's youth and childhood environment, we cannot say the penalty verdict is unsupported. The aggravating evidence of the McDades' supportive relationship with defendant, as well as the brutality of the murder he committed with full knowledge of its impact on their family, was sufficient to sustain the verdict.

### 9. *Cruel and Unusual Punishment*

In his supplemental brief, defendant contends his death judgment constitutes cruel and unusual punishment in violation of the federal and state Constitutions in light of his youth and intellectual shortcomings. With respect to the former, defendant acknowledges he was 18 years old at the time of the killing here. "We previously have rejected the argument that a death penalty scheme that treats differently those who are 18 years of age and older, and those younger than

72

18, violates equal protection. [Citations.] Indeed, the United States Supreme Court has concluded the federal Constitution draws precisely this line, prohibiting the death penalty for those younger than 18 years of age, but not for those 18 years of age and older." (*People v. Gamache* (2010) 48 Cal.4th 347, 405.)

Defendant suggests that *Roper, supra,* 543 U.S. 551 and *Atkins v. Virginia* (2002) 536 U.S. 304, "stand for the principle that it is cruel and unusual, by evolving standards of decency, to execute someone who is over 18, but whose brain functions at a level equivalent to a juvenile." Defendant misreads those cases. In adopting a categorical rule, *Roper* expressly acknowledged that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." (*Roper*, at p. 574.) *Atkins* adopted a similar categorical rule prohibiting the execution of "mentally retarded" persons. (*Atkins*, at pp. 313-321.)

*Roper* teaches that a death judgment against an adult is not unconstitutional merely because that person may share certain qualities with some juveniles. Likewise, nothing in *Atkins* suggests that the execution of someone who is neither a juvenile nor developmentally disabled may nevertheless be unconstitutional based on a showing that person is *actually* immature. (Cf. *People v. Mendoza* (2016) 62 Cal.4th 856, 908-912 [rejecting claim that *Roper* and *Atkins* precluded a death judgment against mentally ill persons].)

In support of his claim, defendant asserts his IQ is 75, he had "high levels of paranoia and suffered from symptoms of schizophrenia," he had trouble reading, and he performed poorly in school. He claims these factors made him prone to manipulation and impulse. To the extent defendant suggests he is entitled

to relief on a showing less than that required in *Atkins*, the suggestion is not well-taken. In any event, "[p]ostconviction claims of mental retardation should be raised by petition for writ of habeas corpus . . . ." (*In re Hawthorne* (2005) 35 Cal.4th 40, 47.) After *Atkins*, the Legislature enacted section 1376. To make out a prima facie case, a petitioner must file a declaration "by a qualified expert stating his or her opinion that the defendant is a person with an intellectual disability" (§ 1376, subd. (b)(1)), defined as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age" (§ 1376, subd. (a)). (See *In re Hawthorne*, at pp. 47-48.) Defendant makes an *Atkins* claim in his separate habeas corpus petition, which is currently pending before us. (See *In re Powell*, S208154 [Claim XII].) We reject defendant's claim on direct appeal without prejudice to resolution of the issue in his separate habeas petition.

### 10. *Challenges to the Death Penalty Statute*

Defendant raises a number of challenges to the constitutionality of California's death penalty statute that we have consistently rejected. He argues that all of these flaws, considered together, amount to a "wanton and freakish" system that randomly selects some murderers for the death penalty. (See *Furman v. Georgia* (1972) 408 U.S. 238, 310 (conc. opn. of Stewart, J.).) We decline to deviate from settled precedent.

" 'The death penalty law adequately narrows the class of death-eligible defendants. [Citations.]' (*People v. Boyce* (2014) 59 Cal.4th 672, 723 (*Boyce*); see also *People v. Linton* (2013) 56 Cal.4th 1146, 1214 (*Linton*).)" (*People v. Salazar* (2016) 63 Cal.4th 214, 255 (*Salazar*).)

" ' "The sentencing factor of 'circumstances of the crime' (§ 190.3, factor (a)) is not unconstitutionally vague and does not result in the arbitrary and

74

capricious imposition of the death penalty." [Citation.]' (*People v. Scott* (2015) 61 Cal.4th 363, 407 []; see also *People v. Merriman* (2014) 60 Cal.4th 1, 105–106.)" (*Salazar*, *supra*, 63 Cal.4th at p. 255.)

"Except for evidence of other crimes and prior convictions, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required." (*People v. Johnson* (2015) 60 Cal.4th 966, 997; see *People v. Sánchez* (2016) 63 Cal.4th 411, 487.) "Nor is the death penalty unconstitutional 'for failing to require proof beyond a reasonable doubt that aggravating factors . . . outweigh the mitigating factors . . . .' " (*Simon, supra,* 1 Cal.5th at p. 149; see *People v. Case* (2018) 5 Cal.5th 1, 50.)[36] " ' "Intercase proportionality review is not required." [Citation.]' " (*Salazar, supra*, 63 Cal.4th at p. 257; see *People v. Scott, supra,* 61 Cal.4th at p. 408; *People v. Boyce*, *supra*, 59 Cal.4th at p. 725.)

"The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b) (*People v. Whisenhunt* [(2008)] 44 Cal.4th [174,] 228), [and] jury unanimity regarding such conduct is not required (*People v. Kelly* (2007) 42 Cal.4th 763, 800. . . ." (*People v. Lee* (2011) 51 Cal.4th 620, 653.) The death penalty statute is not unconstitutional because it allows the

---

[36]     In his supplemental brief, defendant asserts we should reconsider our precedents in light of *Hurst v. Florida* (2016) 577 U.S. ___ [136 S.Ct. 616], which found unconstitutional Florida's death penalty law. We have rejected this claim, noting that "[t]he California sentencing scheme is materially different from that in Florida. Here, a jury weighs the aggravating and mitigating circumstances and reaches a unanimous penalty verdict that 'impose[s] a sentence of death' or life imprisonment without the possibility of parole. (Pen. Code, § 190.3; see *id*., § 190.4.) Unlike Florida, this verdict is not merely 'advisory.' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235, fn. 16; see *People v. Henriquez* (2017) 4 Cal.5th 1, 45.)

consideration of juvenile criminal conduct in aggravation.  We have repeatedly rejected this claim, observing that *Roper* "says nothing about the propriety of permitting a capital jury, trying an adult, to consider evidence of violent offenses committed when the defendant was a juvenile." (*People v. Bramit* (2009) 46 Cal.4th 1221, 1239; see *People v. Lee* (2011) 51 Cal.4th 620, 649.)  As we recently explained in *People v. Rices* (2017) 4 Cal.5th 49:  "Defendant did not receive the death penalty for his juvenile crimes.  He received the death penalty for the execution-style murders of two unresisting robbery victims committed when he was an adult.  No legal principle prohibits admitting evidence of his violent juvenile conduct on the question of what the punishment for those crimes should be." (*Id*. at p. 87.)

" 'The use of the words " 'extreme' " in section 190.3, factors (d) and (g), and " 'substantial' " in factor (g), does not act as a barrier to the consideration of mitigating evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.' (*People v. Linton*, *supra*, 56 Cal.4th at p. 1216.)" (*People v. Cage* (2015) 62 Cal.4th 256, 296 (*Cage*).)

" ' " ' "[T]he statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors." ' " ' (*People v. Edwards* (2013) 57 Cal.4th 658, 766; accord, *People v. Linton*, *supra*, 56 Cal.4th at p. 1216.)  'There is no constitutional requirement that the jury be instructed regarding which of the statutory factors in section 190.3 are aggravating, which are mitigating, and which could be either aggravating or mitigating.' (*People v. Merriman* [, *supra*,] 60 Cal.4th [at pp.] 106–107.)" (*Cage*, *supra*, 62 Cal.4th at p. 296.)

" ' "The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently." [Citation.]  ". . .

California's death penalty scheme does not violate international law and norms." [Citation.]' (*People v. Scott*, *supra*, 61 Cal.4th at p. 408; see also *People v. Boyce*, *supra*, 59 Cal.4th at p. 725.)" (*Salazar*, *supra*, 63 Cal.4th at p. 257.)

### 11. *Cumulative Prejudice*

Defendant contends the cumulative impact of errors at both phases of his trial resulted in fundamental unfairness in violation of the due process clauses of the state and federal Constitutions. We disagree. The guilt phase was complicated by defendant's belated decision not to testify. He was fully aware of the consequences of that decision, however, and no unfairness resulted. Any errors, actual or arguable, were minor. The claim of cumulative prejudice must be rejected.

## III. DISPOSITION

We affirm the judgment in its entirety.

**CORRIGAN, ACTING C. J.**

**WE CONCUR:**

**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**HUFFMAN, J.***
**HULL, J.****

_____
\*     Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

\**     Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Powell

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S043520
**Date Filed:** September 17, 2018

_____

**Court:** Superior
**County:** Sacramento
**Judge:** James I. Morris

_____

**Counsel:**

Neoma Kenwood and Kat Kozik, under appointments by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Stephanie A. Mitchell, Sean M. McCoy and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Neoma Kenwood
PMB #414
1569 Solano Avenue
Berkeley, CA  94707
(510) 528-4775

Paul E. O'Connor
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 210-7750